## V.C. MORTON

v.

## L.R. MORTON, et al.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

April 6, 2005 Session.

Aug. 15, 2005.

Permission to Appeal Denied by Supreme Court Dec. 19, 2005.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

V.C. Morton ("Wife") sued L.R. Morton ("Husband") for a divorce. Wife later amended her complaint to allege that Husband had fraudulently transferred real estate and personal property to the parties' two adult sons ("James and Mace Morton")[1] in an attempt to deprive Wife of her rights to that marital property. James and Mace Morton were added as named defendants to the suit. Prior to trial, all parties stipulated to the return of the real estate and personal property that Husband had transferred to James and Mace Morton for distribution in the divorce. After a bench trial, the Trial Court found and held, *inter alia,* that Husband had committed a fraud in fact by transferring the property to the sons, granted the divorce, and distributed the parties' property. Husband appeals claiming that the property distribution was inequitable and that the Trial Court erred in ordering him to provide medical insurance coverage to Wife for the remainder of her life. James and Mace Morton also appeal claiming the Trial Court erred in depriving them of their right to a jury trial, by finding that the transactions between Husband and James and Mace Morton were a fraud in fact, and by classifying certain farm equipment and machinery as marital property. We modify the property division, and affirm as modified.

### Background

This case, both at trial and on appeal, is particularly fact intensive. For this reason, our discussion of the evidence con-

Jerrold L. Becker and Samuel W. Brown, Knoxville, Tennessee, for the Appellant, L.R. Morton.

Rex A. Dale, Loudon, Tennessee, for the Appellants, James E. Morton and Mace W. Morton.

Carl P. McDonald and Robert N. Goddard, Maryville, Tennessee, for the Appellee, V.C. Morton.

---

1. We refer to James Morton and Mace Morton at times using only their first names simply to prevent confusion as all of the named defendants in this case share the same last name.

tained in the record will, of necessity, be quite detailed.

In May of 2000, after 36 years of marriage, Wife sued Husband for a divorce. Husband answered and filed a counter-complaint. In July of 2001, Wife moved to amend her complaint to add the parties' adult children, James and Mace Morton, as defendants claiming that Husband had fraudulently conveyed marital property to James and Mace Morton in an attempt to deny Wife her rights in that property. Specifically, Wife alleged that immediately prior to the filing of her complaint, Husband conveyed the farm by Warranty Deed to James and Mace Morton for $450,000, an amount which Wife alleges was below the fair market value of that property. The Trial Court entered an Agreed Order in August of 2001, allowing Wife to amend her complaint.

The Trial Court entered an order on May 22, 2003 setting the trial as a non-jury trial. In July of 2003, Wife filed a motion seeking to amend her amended complaint to allege, in part, that in addition to conveying the farm, Husband had fraudulently transferred all of his personal property to James and Mace Morton via a Bill of Sale, but retained all of his debt in an attempt to deprive Wife of her rights to marital property. In July of 2003, James and Mace Morton filed a motion to reconsider the denial of their jury trial demand. By an Agreed Order entered August 22, 2003, the Trial Court, among other things, denied the motion to reconsider the demand for a jury trial. The Trial Court also entered another agreed order on August 22, 2003 allowing Wife to amend her amended complaint. Trial was held in August of 2003.

At trial, Wife testified she was 58 years old and had a high school education. Wife graduated from high school in 1963 and married Husband in 1964. Wife testified that for approximately one year after she and Husband were married, she worked sewing zippers into blue jeans at Levi Strauss, but that she quit because Husband wanted her to stay at home.

After they married, Husband and Wife lived in Husband's grandmother's house for approximately a year and a half, and Wife helped take care of Husband's grandmother. The parties then purchased a mobile home and parked it on Husband's grandmother's property. The parties lived in the mobile home for eight years. During those years, Wife helped work on the family farm and the parties' two sons were born, one in 1970, and the other in 1973. In 1974, the parties moved into a house that Husband built on the farm. This house is the marital residence. Wife testified that she and Husband worked on building the house for approximately four years.

At the time the parties married, Husband was working at ALCOA. He had attended the University of Tennessee and obtained a degree in engineering in 1963. Husband worked at ALCOA until he retired in 1994. Wife testified that when she and Husband married, Husband was not farming.

Wife testified that during the week, while Husband worked at ALCOA, she worked with her father-in-law on the farm driving tractors and trucks. Husband worked on the farm on the weekends. Wife testified that the first piece of property they farmed belonged to Husband's grandmother. She explained that over the years, the parties grew wheat, corn, soybeans, and rye for straw. Wife testified that she helped clear the fields, pick up sticks and rocks, "drive the tractor and cuddle mulch and cuddle pack the fields mostly." She stated she also "drove the grain trucks to the mills or the seed companies for delivery to sell." In addition, Wife testified that she also took care of the

home, cooking, cleaning, sewing, gardening and raising their children. Husband started working on the farm on a daily basis when he retired from ALCOA. Wife testified that after that time, she still helped out with errands and delivering crops, but did not help as much in the fields.

Wife testified that, at first, she and Husband used their personal bank account for the farming operation. Then around 1969, they split the farm accounts into a separate account and Husband took over handling the farm account. Wife testified that Husband's payroll check from ALCOA was used for the house, children, and family, and some for the farm. The farm account was used for the farm and sometimes large purchases. Wife testified that the farm account also had, at times, been used to pay household and family expenses. Wife testified that earnings from the farm went to purchase land and equipment. Wife testified that the farm records were kept in the shop, which was built during the 1980's. When Husband left the marital residence in June of 2000, he took many of the farm records with him.

Wife testified that the Dunlap place ("Tract 1"), a tract of about 92 acres used mostly for farming, was acquired in 1980. Wife testified they purchased Tract 1 with monies from crop sales. However, Wife later testified that no money was paid to Husband's sisters when Husband and Wife acquired the sisters' interests in this property.

Wife testified that the parcel of real estate known as Tract 2 originally consisted of approximately one hundred and eight and a half acres. Wife testified that in 1966, the parties purchased a one-third interest in Tract 2 from Husband's grandmother for approximately six thousand dollars and that they also purchased an interest consisting of approximately 15 acres in this property from Husband's sis-

ter. Wife testified that she signed a note for part of the money used to buy the interest in Tract 2 from Husband's sister.

Wife testified that the Parker place ("Tract 3") is about sixty-nine acres and that the marital residence and the shop sit on a parcel of real estate known as Tract 4, which consists of approximately two acres. Wife also testified that the parties own two pieces of property in North Carolina that were purchased with farm account monies, but Wife doesn't know what the purchase price was. Wife testified that they built a cabin on one of the North Carolina parcels about ten or fifteen years ago. Wife testified that she painted and stained the boards on the outside of the cabin.

Wife testified that Husband became interested in automobiles and purchasing automobile parts and restoring automobiles in the 1980's. She testified that Husband began going to car shows and swaps and Wife accompanied him. They would go on two major trips, one in the spring and one in the fall to Charlotte, North Carolina and to Carlisle in Hershey, Pennsylvania. Wife testified that Husband buys and sells parts and restores cars but never has completed one. Wife testified that all of the automobile equipment in the shed or shop was purchased by Husband. She testified that Husband used money from the farm account to purchase automobile parts and that the vintage automobile part transactions were done mostly in cash. Wife does not know of any vintage cars that her sons purchased. Wife testified that her sons also have worked on restoring cars, but never have completed one. Wife testified she thinks Husband made some money selling automobile parts.

Wife testified that when Husband's aunt died in 1997,

I began remodeling the farmhouse. I put in —— had a bathroom put in,

crown moldings, painted, bought sixty gallons of paint, painted the house. It had never been painted in twenty-five years.... I changed the door, put trims on the outside of the door to make it more attractive, moldings and things. Where it was just a plain aluminum door, I removed it, put in glass doors, decorative doors, and put in hardwood floors and several things like that.

Wife testified she also did some landscaping around the house. Wife testified that she used about thirty thousand dollars, most of which came from an inheritance from her father, to do this work. She stated that she used all of the money she inherited from her father to remodel the farmhouse and the marital residence.

Wife testified that Mace went to college for a couple of years and then started to work for Husband on the farm, and that in 1999, Mace and his wife moved into the farmhouse that Wife had remodeled. Wife testified that Mace and his wife do not pay rent. Wife also testified that she and Husband gave James and his wife half an acre to build a home on a couple of years after James married.

Wife testified that she and Husband "seemed to be going our separate ways," so in January of 2000, she told Husband she wanted a divorce. In June of 2000, Wife obtained a restraining order and had Husband removed from the marital residence "[b]ecause of these transactions that he frauded me." Husband is living in the shop. Husband testified that Wife has a boyfriend.

Wife testified she served as a Blount County Commissioner from 1991 until 2002. Wife also testified that she is on the utility board and receives $150 per month for this service.

Husband, who is 64 years old, testified he retired from ALCOA after thirty years under a special plan that gave him unemployment for two years at three-fourths of salary, then went to half of salary, and then dropped when Husband turned 62. Husband explained that three-fourths of his salary was approximately $3,000 per month, half was approximately $2,100 per month, and the amount dropped to approximately $1,542 when he turned 62 in September of 2001. Husband testified he began receiving $2,100 per month in September of 1996. Husband testified that when he retired from ALCOA, he and his dad were farming together and there was some farm income, "but there was more money going out because the debts were increasing but at least you had money to spend...."

Husband testified that Morton and Sons Farm is a sole proprietorship. Husband testified he claimed losses for the farming operation on tax returns from 1995 through 2000 because:

The expenses had just gotten so much greater than the amount of money coming in. And a lot of that was due to fuel prices and a lot of it was due to labor, the fact that we couldn't get labor. And we had started hiring these Mexicans that were getting harder and harder to get and costing more and more. And sometimes over a thousand dollars a day just for the Mexicans.

Husband testified that he claimed a large loss in 2000 because the price of grain fell drastically and grain and straw were the farm's only products. He further testified that during this period, he was incurring debt and borrowing.

Husband testified that in May of 2000, he owed approximately $350,000 in debts. Husband testified he withdrew approximately $230,000 from his 401k with ALCOA to pay debts. Wife testified that she received none of the money that Husband removed from his 401k account. Husband

further testified that in August of 2001, he borrowed $100,000 unsecured from a friend, Walter Riggs, and used this money to pay debts. Husband also testified that in May of 2000, he received $47,000 net at the closing from the sale of the farm to his sons and that he receives $22,000 every six months from his sons. Husband testified that he used this money also to pay debts, but stated he still owes "about three hundred and forty something thousand dollars." Husband testified he still owes nearly what he owed in 2000, in part, because he had a loss of $262,000 on his 2000 tax return. Husband's 2000 tax return shows that Husband received a refund of $45,027.97. Husband testified he used this money to pay debts. Wife testified that she did not receive any of this refund. Husband claims he shared this with Wife by paying on her bills.

Husband testified that Wife has no interest in the marital home, the shop, Tract 1, Tract 3, and Tract 4, and that Wife has only a one-twelfth interest in Tract 2. Husband denies paying Mrs. Dunlap out of any personal account for Tract 1 and says that his dad negotiated the deal and made payments of twenty thousand dollars for ten years and the property was put into Husband's name and Husband's father's name. Husband also disputes Wife's assertion that he paid his grandmother $6,000 for her interest in Tract 2, but a codicil to Husband's grandmother's will states she sold to Husband a one-third interest in her farm and gave the proceeds of the sale to another family member. In addition, in a document prepared by Husband in connection with this lawsuit, Husband states he purchased a one-third interest from his grandmother in Tract 2. Husband further

admitted that he borrowed $50,000 and bought out his sister's interest in Tract 2. Husband admitted that Wife also signed the $50,000 note. Husband testified that he never made any payments on Tract 3, and that Tract 4, which contains the marital residence, was deeded to him by his grandmother. However, Husband later admitted that he did pay during the marriage for portions of his interest in Tract 3.

David Braun, a licensed certified appraiser, testified as an expert witness for Wife. Mr. Braun appraised Tract 1, containing approximately 92 acres, to have a current value of $625,000 for use as a residential subdivision. Mr. Braun's appraisal gave a value for Tract 1 as of May of 2000, of $575,000. Mr. Braun appraised Tract 2, consisting of approximately 120 acres of vacant land used for agricultural purposes, to have a current value of $990,000. Mr. Braun's appraisal gave a value for Tract 2 as of May of 2000, of $900,000. Mr. Braun appraised the property with the marital residence, a parcel containing approximately 22 acres, to have a current value of $400,000 and to have had a value as of May of 2000, of $360,000.[2]

Husband admitted that Wife was a homemaker, and that over the years she took care of their boys, performed tasks around the house, cooked, ran errands to get parts, and drove the truck to deliver straw. When Husband was asked whether Wife helped to build the marital residence, Husband replied, "It's a matter of opinion. . . . She was there when the house was built."

Husband testified he inherited his father's interest in the farm tools and equipment upon his father's death in 1995. Husband testified that since his father's

---

2. When appraising the property, Mr. Braun divided the tracts slightly differently than the parties described them. Mr. Braun did not appraise Tract 3 as a separate tract, but apparently divided the parcels such that Tract 2 and Tract 4 each encompassed some of the land that the parties refer to as Tract 3.

death, the one thing Husband purchased was the combine in 1996. Husband testified that, for the most part, he agrees with the values the appraiser assigned to the farm equipment, except for the value assigned to the combine.

Husband testified that he and Wife had a joint checking account and that his AL-COA income was direct deposited into that account. Husband testified that as far as he knows, that is the only money that ever went into that account. Husband testified that none of the money in regard to the cars went into the joint account and testified it didn't necessarily go into the farm account either because he dealt in cash. Husband testified he is not aware of any 1969 Camaro parts being purchased using the farm account.

In February 2000, Husband went to the Loudon County Clerk's office and transferred titles to a number of vehicles to James and Mace Morton. Husband testified he didn't sell James or Mace any motor vehicles or car parts, but rather just transferred ownership on the titles. When asked why the cars were originally titled in Husband's name, Husband stated:

> [James and Mace] found out you could get a title history on the cars, which was real interesting to go back and see all the—you might even find your next door neighbor had owned the car at one time, and so they—they wanted to pursue title histories of each and every car that they could. And before you could do that it had to have a title registered in your name. You couldn't just send in a title in somebody else's name. And so the age that they were and what not and I had—familiar with the process I titled the cars and obtained the history on what I could for them.

When asked the purpose of the transfer of titles, Husband stated:

> That was based on—let's see, these cars were titled in my name before that, like I said, to get these title histories, and a lot of those were obtained at the Blount County Courthouse, which in my opinion they are not cooperative. They—you stand in line a long time and very difficult process where Loudon is much smoother. There's not a crowd and just a better place to deal with.

Michael Rutter, who is in the business of restoring and customizing automobiles, visited the farm and inventoried the cars and car parts on the property. Husband testified that Mr. Rutter's inventory of items located on the farm includes cars and car parts owned by James and Mace.

Husband testified he didn't make a habit of keeping records regarding buying and selling car parts. Husband testified he never has restored a vehicle and that he bought parts primarily for repair. He further testified that he bought a lot of parts for other people. When asked how he knew he wasn't making money at buying and selling car parts, Husband replied "I don't know. I guess it depends on whether your wallet's heavier when you come back than it is when you go."

Husband testified he has a company paid life insurance policy through ALCOA for thirteen thousand dollars with James and Mace as the beneficiaries. Husband testified that he changed the beneficiary designation in 2000 after Wife told him she wanted a divorce.

Husband testified regarding the transaction wherein he sold the farm to James and Mace in May of 2000. Husband testified that the total purchase price for the farm was $440,000 and the purchase price for the Bill of Sale items was $10,000. Husband testified that his sons made a down payment of $25,000 each toward the farm. He testified that his sons also executed promissory notes and had made the

payments due to Husband. Husband testified that his sons have paid him for all of 2000, 2001, 2002, and the first payment for 2003. Husband testified that the deal between himself and James and Mace was that Husband was to continue operating the farm until the end of 2000. Husband testified he did not operate the farm after January 1, 2001. However, Husband admitted that he continued to borrow money from PHI after he sold the farm property to his sons in May of 2000, and he never told PHI that he no longer owned the farm or equipment and had no source of income.

Husband testified that John Prospero owns several items stored on the farm property. Husband testified that Mr. Prospero owns the 1988 Peterbilt truck, which is on the shop premises. Husband testified that he is supposed to put a body on the Peterbilt truck and that delivery of the truck with a body to Mr. Prospero will act as satisfaction of a $22,000 debt Husband owes to Mr. Prospero. Husband testified that Mr. Prospero also owns a 1933 Ford Colorado coupe and parts stored on the farm because Mr. Prospero asked Husband to store these items for him. Husband also testified that Mr. Prospero owns two 1934 Ford two-door sedan bodies and a 1934 Ford Victoria body frame and windows that are stored on the farm. Husband testified he sold these items to Mr. Prospero. Husband also testified that Mr. Prospero gave Husband money and told Husband to obtain a 1969 Camaro for him, and Husband did so.

Mace Morton testified that he is employed by Morton and Son Farms and that since 2001, he has been farming in partnership with David Morgan and James Morton. Mace testified he is claiming a credit against the martial estate for money he paid for the transaction that was set aside.

Mace testified he purchased cars over the years with cash earned from working on the farm. Many of the cars at issue are Camaros that were purchased when Mace was ten, twelve, fifteen, and seventeen years old. Mace stated: "I had no expenses, so the money that I earned on the farm, you know, I just saved, and, also, I got a little money from helping my great aunt Lucille mowing the yard, doing chores for her." Mace testified that he went to school during the day and attended college for two years, so he was working on the farm only part-time during the years the Camaros were purchased. Mace testified that he and his brother purchased the cars together and that Mace does not have a 100% interest in any of the cars. Mace testified that they stored cars and car parts on the farm and testified that even though the cars were titled in Husband's name, he and his brother paid for them and worked on them. However, Mace admitted he has nothing showing that he had any interest in any of the Camaros prior to February 2000. Mace testified that they purchased the last of the Camaros in 1994 when Mace was 21 years old.

Mace testified that his tax return for 1998 shows a total gross income of $6,730.70. Mace testified he does not recall making any more money than that. Mace testified that his wife was not working outside of the house at that time and that they had a child in 1998. Mace testified that his tax return for 1999 shows a total income of $7,045.75. When questioned, Mace testified he got the $25,000 for the down payment made to Husband from the sale of farm products, and $5,000 from the sale of an engine, and the rest from approximately $9,000 in cash that was life savings he kept in his home. Mace testified his tax return for 2000 shows gross farm income of approximately $5,500. He admitted that his only income

is farm income except that in 2001 he started leasing his Friendsville home. When questioned, Mace admitted that a Board of Probation Parole Pre–Sentence Report ("Pre–Sentence Report") shows Mace's liabilities as a farm payment to Husband of $20,291, and debt for a Honda and a Discover card, and his assets as annual income from the farm of $30,000, annual rental income of $5,400, the $10,000 value of his home, a one-half interest in the farm of $275,000 and a one-half interest in farm equipment of $40,000. The Pre–Sentence Report, however, shows no claimed interest with regard to cars or car parts. Mace testified he did not mention the cars because it was hard to put a value on the cars and he didn't feel the cars were important. Mace admits, however, that Mr. Rutter put a value of a little over $100,000 on the interest Mace and his brother share in the cars.

James Morton testified he works for Mahle in Morristown and has a ten percent interest in Morton and Sons Farm. James testified he began working at Mahle in 1993 and since that time has not helped out regularly on the farm. James testified that Mr. Rutter's report lists several engines as complete and ready to run, but James says they are not ready to run and are at different stages of completion. James testified that other people have ownership interests in engine and car parts located on the farm including Chancy Parks, Vernon McClain, Greg Hunt, Mike Gibson, and Mark Jones. James further testified that there are thirteen Camaros that are owned either by him or jointly by him and his brother that were titled in his father's name. These cars were purchased from the 1980's until around 1994 and all were cash purchases. James claims his father helped him and his brother locate cars and bring them home, but never helped them purchase the cars. James testified that they changed the car titles in

February of 2000 because "we had been talking to my dad and learned of his debts over the years and, to be honest with you, we were afraid of dad losing the farm and losing all of his property, and we realized those cars were still in his name and we wanted to make sure that they went back to their rightful owner before that happened."

James testified he got the money for the $25,000 down payment he made to Husband from three cashier's checks from the sale of running engines and parts, and from some cash. He testified he has a savings account but there is nothing in it and that he keeps his savings in cash at his house. James testified that the approximately $9,000 in cash that he used for the down payment was money he kept at the house. James testified he gave Husband the cashier's checks and cash and Husband obtained the $25,000 cashier's check for the down payment. James testified he makes a salary of around $55,000 per year.

John Prospero testified he has loaned Husband and Wife money over the years. Mr. Prospero testified that in 1995, he loaned $25,000 to the parties for a Ford tractor. The parties signed a note for this loan. Mr. Prospero testified that in 1996, he loaned the parties $15,000 for a 1982 John Deere combine and that the parties again signed a promissory note. Mr. Prospero also testified he sold the parties a John Deere tractor for $15,000 and took back a loan with 9% interest. Mr. Prospero testified he has not been paid anything on any of the debts. Mr. Prospero testified that he owns a 1988 Peterbilt truck stored on the Morton farm and that Husband is supposed to be putting a bed on the Peterbilt truck. Mr. Prospero explained that Husband purchased the Peterbilt truck from Mr. Prospero in 1996 and then made no payment on that indebtedness, so Mr. Prospero agreed to buy back

the truck and wipe out the debt if Husband would deliver the truck with an appropriate bed on it so that Mr. Prospero could use it in his lumber business. Husband has not yet delivered the Peterbilt truck with an appropriate bed, and so the debt still exists. Mr. Prospero also testified that he owns cars or car parts stored on the Morton farm.

James Willis testified that he sold two 1969 Camaros and some car parts to James and Mace Morton for cash. Mr. Willis testified that these sales occurred when James Morton was approximately 16 years old. Mr. Willis testified that one of the 1969 Camaros is an orange one that currently is sitting in the Morton's shop. Mr. Willis testified that he sold this particular car to James Morton for approximately $2,000 cash. Mr. Willis further testified that he sold the other 1969 Camaro to James Morton for approximately $1,000 cash.

Theresa Morton Cromwell, Husband's sister, testified that she has lived across the road from the farm house since 1999 and that prior to that, she lived next door to Husband and Wife since 1969. Ms. Cromwell testified that over the years, she has seen Wife driving farm trucks sometimes loaded, driving tractors, loading straw, sowing pine seedlings, and helping to clear fields of sticks, brush, and rock. Ms. Cromwell also testified that over the years she saw Wife garden, mow the yard, and cook for the farm workers. Ms. Cromwell testified that Wife kept a beautiful house and that Wife took care of Husband's grandmother. Ms. Cromwell admitted that she considers Wife a friend and that Ms. Cromwell and her brother don't speak and haven't spoken in approximately six years.

The Trial Court entered an order October 22, 2003, which, *inter alia*, set aside the Warranty Deed and Bill of Sale from Husband to James and Mace Morton and divested title and all interest out of James and Mace Morton and re-vested it in Husband. As reflected in the order itself, the parties had announced their agreement that the Warranty Deed and the Bill of Sale, with the exception of certain specified items listed in the Bill of Sale, "are set aside, are void and held for naught." In other words, James and Mace Morton announced their agreement to the Trial Court to return the property so that it is "re-vested in [Husband]."

The October 22 order also found and held, in part, that the Warranty Deed and Bill of Sale executed by Husband in anticipation of divorce were a fraud in fact and that any claim for repayment of down payments and periodic payments is a matter between James and Mace Morton and Husband and does not involve Wife; that Husband and Wife are divorced; that all cars and car parts are the property of James and Mace Morton with the exception of specific items valued at $11,100 which are found to be marital assets and are awarded to Husband with Husband to pay Wife $5,550 for her interest in this asset; and that property claimed to be owned by John Prospero including the Peterbilt truck and car and car parts are the property of John Prospero.

The October 22 order further found and held, *inter alia*, that Husband's 401k in the amount of $233,914 was a marital asset depleted by Husband with Wife receiving none of these monies. Husband was ordered to pay Wife $21,000 as an off-set for 401k monies used by Husband to pay his attorney and then to pay Wife $106,457 as Wife's one-half of the value of the 401k; that all of the farm equipment is a marital asset and is awarded to Husband with Husband to pay Wife $75,000 for her interest in this equipment; that Husband's ALCOA pension is a marital asset and that

Wife is awarded one-half of this pension; that Husband is ordered to pay Wife $482.50 per month as the amount equal to one-half of Husband's Social Security benefit effective at age 62 and upon application by Husband for Social Security benefits Wife is awarded, in place of the $482.50, one-half the actual benefit amount received by Husband each month; and that Husband is required to provide medical insurance coverage for Wife.

The October 22 order further found and held, *inter alia,* that the two real properties located in North Carolina in Husband's name are marital property and awarded Wife a one-half interest in these properties and provided that Husband and Wife each have the option to buy out the other's interest in these properties for $29,500 within 60 days or the property is ordered to be sold; that the real property located in Blount County, Tennessee is partially a marital asset and partially the separate property of Husband and taking into account the marital debt the Trial Court ordered Husband to pay Wife $700,000 as her share of this property determined to be a marital asset; that Husband shall be responsible for the marital debts; and that the tax refund of approximately $45,000 received by Husband for the year 2000 was a marital asset and Husband is ordered to pay Wife $24,500 as her share of that refund.

Husband and James and Mace Morton appeal to this Court.

### Discussion

Although Husband raises multiple issues on appeal, the dispositive issues involve: 1) whether the overall marital property distribution was equitable; and, 2) whether the Trial Court erred in ordering Husband to provide Wife with medical insurance coverage for the remainder of Wife's life. James and Mace Morton raise several is-

sues, which we restate as: 1) whether the Trial Court erred in denying James and Mace Morton their right to have issues concerning them decided by a jury; 2) whether the Trial Court erred in finding that the Warranty Deed and Bill of Sale were a fraud in fact and that James and Mace Morton were not entitled to credits against the marital estate for payments involved in those transactions; 3) whether the Trial Court erred in finding that the farm equipment and vehicles were part of the marital estate. Wife raises an issue regarding whether the appeals filed by Husband and by James and Mace Morton are frivolous.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R.App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

"When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.,* 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.,* 970 S.W.2d 941, 943 (Tenn.1998)).

We first will consider Husband's issue regarding whether the overall property distribution was equitable. Courts must look to Tenn.Code Ann. § 36–4–121 when determining how to distribute property in a divorce. In pertinent part, Tenn.Code Ann. § 36–4–121 provides:

(b) For purposes of this chapter:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing . . .

(B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, . . .

\* \* \*

(D) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

\* \* \*

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage;

\* \* \*

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;

\* \* \*

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties. . . .

Tenn.Code Ann. § 36–4–121 (2001).

 A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill,* 826 S.W.2d 443, 449 (Tenn.Ct.App.1991). As noted by this Court in *King v. King,* when dividing marital property:

The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen,* 937 S.W.2d 823, 832 (Tenn.1996);

*Ellis v. Ellis,* 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown,* 913 S.W.2d [163] at 168.... In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson,* 797 S.W.2d 599, 604 (Tenn.App.1990).

*King v. King,* 986 S.W.2d 216, 219 (Tenn. Ct.App.1998) (quoting *Roseberry v. Roseberry,* No. 03A01–9706–CH–00237, 1998 WL 47944, at *4, 1998 Tenn.App. LEXIS 100, at *11–12 (Tenn.Ct.App. Feb.9, 1998), *no appl. perm. appeal filed).*

Husband contends that the Trial Court failed to base its division of the marital estate on the factors set out in Tenn.Code Ann. § 36–4–121, that the Trial Court erred in classifying certain real property as marital property, that the Trial Court erred in classifying the farm equipment and machinery as marital property, that the Trial Court miscalculated the value when making an award to Wife of funds from Husband's 401k, and that the Trial Court erred in awarding Wife one-half the value of Husband's Social Security benefits available to Husband at age 62 when Husband has chosen to delay drawing any Social Security benefits until he is older.

■ It is not the role of this Court to tweak a trial court's distribution of property. Rather, we must look to determine if the overall property distribution is equitable. *King,* 986 S.W.2d at 219. Husband, as is often the case in appeals to this Court concerning a division of marital property, wishes to focus on whether the division as to particular assets was equitable rather than whether the overall property distribution was equitable. We decline to do so as the goal is an overall equitable marital property distribution.

■ The evidence shows that this was a 36 year marriage and that Wife contributed to the marriage by being a homemaker, raising the parties' two children, and helping out on the family farm, among other things. Equally as obvious is that the Trial Court credited Wife's testimony over that of Husband's, James's, and Mace's in arriving at many of its factual findings. The evidence further shows that the real property at issue was acquired during the marriage and that much of this property was purchased either through cash and loan transactions using marital funds, or by exchanging marital property for the new property and, thus, constitutes marital property, whether Wife's name appears on the deeds or not. A portion of the real property was inherited by Husband and the Trial Court did find that some of this real property, $300,000 worth, constituted and remained Husband's separate property. The evidence also shows that much of the farm equipment and machinery was acquired during the marriage. Husband testified that he inherited some farm equipment from his father. However, there is no evidence as to whether the farm equipment he inherited still is being used on the farm. We also note the apparent discrepancy in Husband's testimony and that of Mr. Prospero regarding the farm equipment. Husband testified that since his father's death in 1995, the one thing he had purchased was a combine in 1996. Mr. Prospero, however, testified that he had often loaned Husband and Wife money over the years including $25,000 in 1995 for the purchase of a Ford tractor. Mr. Prospero also loaned the parties $15,000 in 1996 to purchase a 1982 combine. Mr. Prospero also testified about selling the parties a John Deere tractor for $15,000. It is difficult to square Mr. Prospero's testimony with Husband's position that the farm equip-

ment and machinery were not part of the marital estate.

The evidence shows that with a few exceptions the automobiles and automobile parts at issue were purchased by Husband during the marriage and, thus, constitute marital property. The Trial Court noted the exceptions in its order by recognizing that certain items belong to James and Mace Morton and that certain items belong to Mr. Prospero.

The Trial Court found, and the evidence does not preponderate against this finding, that Husband withdrew funds from his 401k and that Wife did not receive the benefit of these funds. The evidence further shows that in August of 2001, after Wife filed for divorce, Husband borrowed $100,000 unsecured from a friend. In addition, the evidence shows that Husband received a tax refund for 2000 of approximately $45,000, and that Wife did not share in this money. The Trial Court found that Husband attempted to convey to James and Mace Morton both real property and personal property that were part of the marital estate. Again, the evidence does not preponderate against these findings by the Trial Court.

■ After considering the Trial Court's overall property distribution in light of the various factors set forth in Tenn.Code Ann. § 36–4–121(c), we are unable to conclude that the property distribution was inequitable or that the Trial Court otherwise erred when distributing the parties' marital property with one exception as to Husband's Social Security benefits. While declining to tweak the Trial Court's property division, we do believe that the Trial Court erred in its overall equitable property distribution by awarding Wife one-half the value of Husband's Social Security benefits available to Husband at age 62 even though Husband has chosen to delay drawing any Social Security benefits until a later date. Contrary to Wife's vigorous argument that the Trial Court's division of Husband's Social Security was alimony rather than part of the property distribution, we hold the Trial Court's division of Husband's Social Security was clearly a part of the overall distribution of the marital estate and must be reviewed as such. We believe it is inequitable to require Husband, as part of the overall property division, to give Wife a share of this property as if Husband was receiving his Social Security benefits now, but to also allow her the benefit of receiving a larger amount later because Husband delayed drawing his Social Security benefits to a later date. We believe the equitable distribution of the overall marital estate requires that the Trial Court's judgment be modified to remove the requirement that Husband is ordered to pay Wife $482.52 per month as her share of Husband's Social Security benefits even though he has chosen to not yet receive them. We leave in place that portion of the Trial Court's division of Husband's Social Security benefits providing that Wife will receive one-half the benefit amount actually received by Husband each month once he starts drawing his Social Security benefits.

Husband's remaining argument basically is that much of the real estate was received by him "through his bloodline" and that he continued to keep this property separate from the marital estate. Husband in making this argument ignores the evidence of Wife's contributions over this long term marriage directly related to the preservation of this property, ignores Wife's contributions to the acquisition of much of this property such as being a co-borrower on various promissory notes with Husband to purchase the properties, and ignores the clear evidence that Husband and Wife throughout this long term marriage treated most, if not all, of this prop-

erty as part of the marital estate. The Trial Court agreed with Husband, but only to the extent that it found that real property worth $300,000 remained Husband's separate property. Based upon the extensive and complicated factual record before us, the evidence does not preponderate against the Trial Court's findings, both explicit and implicit, as to what was marital property and the value of the property that remained Husband's separate property. Likewise, the evidence does not preponderate against the Trial Court's overall property distribution as being an equitable distribution of the entire marital estate with our one modification as to Husband's Social Security benefits.

We next consider Husband's issue regarding whether the Trial Court erred in ordering Husband to provide Wife with medical insurance coverage for the remainder of Wife's life. Because the amount of alimony to be awarded, if any, is within the sound discretion of the trial court in light of the particular circumstances of the case, appellate courts will not alter such awards absent an abuse of discretion. *Lindsey v. Lindsey,* 976 S.W.2d 175, 180 (Tenn.Ct.App.1997). The factors to be considered in deciding whether to award alimony are contained in Tenn. Code Ann. § 36–5–101(d)(1) and include:

(A) The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36–4–121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn.Code Ann. § 36–5–101(d)(1) (2001). This statute also provides, in pertinent part: "The court may also direct a party to pay the premiums for insurance insuring the health care costs of the other party." Tenn.Code Ann. § 36–5–101(f)(1) (2001).

After considering the facts of this case in light of the various factors set out in Tenn.Code Ann. § 36–5–101, we find no abuse of discretion in the Trial Court's ordering Husband to provide Wife with

medical insurance coverage for the remainder of Wife's life.

■ We next consider the issues raised by James and Mace Morton. As to the issue of whether the Trial Court erred in denying James and Mace Morton the right to have issues concerning them decided by a jury, we find this issue to be without merit. All parties stipulated prior to trial to the return of the real and personal property transferred by Husband to James and Mace Morton so that all rights in this property were "divested out of James and Mace and re-vested in [Husband]." The return of this property, by agreement of all parties, effectively resolved any issues concerning this property between James and Mace Morton and Wife, and, thus, James and Mace Morton were not entitled to a jury trial on these issues as no such issues remained to be resolved.

Also important, as found by the Trial Court in its October 22, 2003 Order, James and Mace Morton claimed to have made down payments and periodic payments to Husband for this property, and that James and Mace Morton's claim against Husband concerning these payments allegedly made by them to Husband neither involved Wife nor any property awarded to Wife by the Trial Court. Further, also as found by the Trial Court, James and Mace Morton raised their argument concerning this property only in their answer to the amended complaint and never filed "any complaint against any party...." All of this led to the Trial Court's holding, which we believe to be correct, that the Trial Court's October 22, 2003 Order "leaves James and Mace to seek any recovery from [Husband] as they may choose to do." If James and Mace Morton do seek to recover from Husband their claimed down payments and periodic payments, their right to a jury to resolve that dispute

exists just as much now as it did before the entry of the Trial Court's October 22, 2003 Order. We also note that the August 22, 2003 Order denying the motion of James and Mace Morton to reconsider their demand for a jury trial is an "Agreed Order" so that, at least from the face of this Agreed Order, James and Mace Morton "agreed" to the denial of their motion to reconsider their jury demand.

James and Mace Morton also raise an issue regarding whether the Trial Court erred in finding that the Warranty Deed and Bill of Sale were a fraud in fact and that James and Mace Morton were not entitled to credits against the marital estate for payments involved in those transactions. This issue also is without merit as any payments James and Mace Morton made were made to Husband, not to Wife. Wife received no money from either James or Mace Morton. The evidence does not preponderate against these findings of the Trial Court. Any claims that James and Mace Morton may have for repayment of their down payments or periodic payments made to Husband are claims against Husband. This issue does not involve Wife, and James and Mace Morton are free to pursue their claims seeking reimbursement from Husband, if they choose to do so.

As for the issue raised by James and Mace Morton regarding whether the Trial Court erred in finding that the farm equipment and vehicles were part of the marital estate, we have sufficiently addressed this issue when discussing Husband's issues and James and Mace Morton's jury demand issue. We find no error in the Trial Court's classification of this property. We also note that the farm equipment and vehicles which James and Mace Morton claim belong to them were distributed not to Wife but to Husband. James and Mace Morton's claim against Husband as to this

farm equipment and vehicles still is available to them if they choose to pursue it, including any right to have a jury to determine the issues. James and Mace Morton's claim against Husband as to the farm equipment and machinery was not resolved by the Trial Court as this claim never was presented to the Trial Court. James and Mace Morton's claims against Husband as related to their ownership interest in the farm equipment and vehicles, along with their claims against Husband for their down payments and periodic payments on the real estate, never were presented for resolution in this lawsuit, and the Trial Court properly made no attempt to address them. James and Mace Morton are free to pursue in a separate lawsuit these claims against Husband, if they so choose.

■ Finally, we consider Wife's issue regarding whether the appeals filed by Husband and by James and Mace Morton are frivolous. "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed." *Industrial Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn.Ct.App.1995) (quoting *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202 (Tenn.1978)). In the exercise of our discretion, we decline to hold the appeals frivolous, and further decline to award Wife any attorney fees and costs incurred by this appeal.

### Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-third against the Appellant, L.R. Morton, and his surety; one-third against the Appellants, James and Mace Morton, and their surety; and one-third against the Appellee, V.C. Morton.