IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 7, 2009 Session

## KATHERINE DODGE GRIBBEN WARWICK v. EDWARD JOSEPH WARWICK, SR.

**Appeal from the Circuit Court for Hamilton County**
**No. 08-D-398    W. Jeffrey Hollingsworth, Judge**

**No. E2009-00635-COA-R3-CV - FILED JANUARY 28, 2010**

After ten years of marriage, Katherine Dodge Gribben Warwick ("Wife") filed a complaint for divorce against her spouse, Edward Joseph Warwick, Sr. ("Husband"). Pursuant to the parties' pre-trial stipulation, the court granted Husband a divorce; incorporated the parties' agreed permanent parenting plan; and distributed some of the parties' personal property. Following a bench trial, the court classified, valued, and distributed the balance of the parties' property. Husband appeals, challenging (1) the court's decree as to how Wife was to receive her equity in the marital home, (2) the classification and allocation of certain debts, and (3) the overall property division. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Daniel K. Habenicht, Chattanooga, Tennessee, for the appellant, Edward Joseph Warwick, Sr.

David W. Noblit, Chattanooga, Tennessee, for the appellee, Katherine Dodge Gribben Warwick.

**OPINION**

I.

As we have noted, matters pertaining to the parties' two children were settled by their pre-trial agreement.[1] Since there was no claim for spousal support, the November 2008 bench trial focused on the division of the parties' remaining net marital estate.

At the time of trial, Husband was 41, Wife was 40, and their minor children were ages 10 and 6. Wife had a son from a previous marriage who lived with the parties. Neither party had any apparent health problems other than Husband's alcohol addiction, a condition from which he was recovering. Both saw therapists to deal with their marital and personal issues.

Wife had a bachelor's degree in secondary education. During the marriage, she worked as a teacher, taking time off when the children were born. Wife was the one who was primarily responsible for maintaining the household. At the time of trial, Wife worked full-time as an instructional coach at Hixon Middle School earning about $38,000 a year. She was unable to earn more money in her current job without an advanced degree. Wife brought no separate property to the marriage.

Husband had a law degree. He had practiced law for five years, earning as much as $200,000 a year before deciding, in 2005, to change careers and go to work with his father as an investment broker. In December 2007, Husband and his father were recruited by Morgan Stanley to leave their positions with Raymond James. As a part of this move, Husband received a $50,000 bonus in December 2007. In order to ensure that Husband would remain at Morgan Stanley, he signed a promissory note in which he agreed to repay the bonus in installments over nine years. Under the terms of his employment, he was to be reimbursed by the company, dollar for dollar, for his bonus installment payments, provided he continued to work at the company. At the time of trial, Husband had a base salary of $60,000 a year, and had not yet earned any commissions. Husband was also part of a partnership within Morgan Stanley. His partners were his father and another broker. Under their partnership agreement, Husband was to receive ten percent of the revenue the partnership produced, after first reducing the revenue for the share retained by the firm.

Husband had a separate estate with a stipulated balance of $326,000, the remainder of an inheritance he received from his grandfather.

---

[1]In short, the parenting plan provided that each party would be the primary residential parent of one of the children with regular visitation with the other child. The plan provided for joint decision making regarding the children.

In January 2007, Husband discovered that Wife had had an extramarital affair. Before learning of this, Husband had gone to an organization known as the Counsel of Alcohol and Drug Abuse Services ("CADAS") because he felt that "something wasn't right," but he soon realized that alcohol was not the issue. Husband reported that he had been sober during most of 2007, but that Wife's affair had led him to drink that January. Husband, without discussing it with Wife, decided to seek treatment at The Meadows, an in-patient facility in Arizona, because of Wife's betrayal and because he was "out of [his] mind." At The Meadows, Husband was diagnosed with "post traumatic stress disorder." As Husband explained it, he had grown up with an angry, deceitful mother and he was reliving his childhood experience as a result of Wife's similar behavior. Husband "doubted" he would have gone to The Meadows if Wife had not cheated on him. Wife agreed her affair hit Husband "very hard," but disagreed that it was necessarily the reason Husband sought treatment. Wife contended that The Meadows treated many problems and said Husband had refused to tell her exactly why he went there. Husband remained at "The Meadows" for a month at a total cost of $37,000, $7,000 of which was reimbursed by insurance provided through Wife's employment. Husband paid the remaining $30,000 out of funds from his separate estate.

Before Husband went to The Meadows, the parties agreed that Wife and the children would reside in the marital home and keep the household expenses current. In addition, the parties agreed to list the marital home for sale with a relator both parties had met. On listing the home at $495,000, the parties received one offer – for $300,000 – that they rejected. The agent had advised listing the home at $400,000 – 450,000 and felt it would be "hard at 495 to get a reasonable person" to come see the property. Since February 2007, the median price of homes in the Chattanooga housing market had fallen about 10 percent. At one point, a "for sale" sign was put in the yard, but the parties' agreement stated there would be no yard sign and it was eventually removed. The agent testified that the lack of a sign would obviously affect any drive-by traffic. The agent talked with both parties about lowering the price to encourage interested buyers. Husband returned to live in the home after his stay in Arizona. Just before the trial, he agreed to lower the sales price to $375,000, but after three days instructed the agent to take the house off the market.

Wife filed for divorce in February 2008. The following month, while Husband was in Arizona, Wife moved out of the marital home with the children and leased a new home with an option to purchase. Wife was under the impression that the parties would sell the marital home quickly and she wanted to get the children established in a home she could afford within their school zones as soon as possible. In addition, Wife felt it was best for her to move out before Husband returned home. After renting for six months, Wife exercised her option and purchased the home for $157,000. She obtained her own loan and borrowed the down payment from the seller. Wife said her earnings very closely met her expenses each

month.  She was scheduled to repay the down payment on her home in December 2008, but did not have the money.  It was her plan to apply part of her share of the equity in the marital home to pay that loan.  At the time of trial, each party was essentially paying his/her own expenses.

The parties stipulated that the equity in their largest asset, the marital home, was $68,750.  In addition, the value of Husband's 2002 Chevrolet Avalanche was stipulated as $8760.  Wife drove a 2006 Chevrolet Suburban loaded with options.  Its value based on the Kelly Blue Book was between $21,120 and $21,970.  In addition, each party had an IRA and Wife had $7,263 in her Tennessee Board of Education retirement plan that would soon vest.  Wife had two other accounts, a checking account containing $5,994.81, some of which was funded with monies transferred from the parties' joint checking account, and an account at Morgan Stanley which mainly held child support payments she had received from her ex-husband for the couple's son.

Regarding marital debt, the parties owed $1,033 to the IRS related to the late payment of their 2007 taxes.  The remainder of their agreed debt, totaling some $2,000, was owed to CADAS and various doctors and therapists.  In addition, Husband claimed as a marital debt the bonus/loan from Morgan Stanley, the fee for Husband's treatment at The Meadows, and money owed to Husband's father.  Lastly, Husband claimed a debt of $15,000 in "moving out expenses" that he attributed to household bills, home repairs, and living expenses he paid from April – November 2008 after Wife moved out of marital home.

On December 19, 2008, the trial court entered its final judgment.   Pursuant to the parties' stipulation, the court awarded to each party the personal property in their possession with a few clearly stated exceptions.  As a prelude to its division of the remaining marital property, the court found as follows:

> [T]he . . . parties were married and living together for approximately 10 years.  Both parties are relatively young and in good health.  The Husband has acknowledged his alcoholism but seems to be doing well in his recovery.  The parties are both capable of earning a living.  However, the Husband does have greater earning capacity.  The Wife makes approximately $39,000 working in the Hamilton County schools and the Husband has a base salary of $60,000 in his job with Morgan Stanley. In addition, the Husband is a licensed attorney who has previously practiced law in Tennessee.

There have been allegations of dissipation of marital assets, but the Court notes that neither party has recklessly spent or dissipated such assets.

The Husband has [a] significant separate estate in the inheritance from his grandfather.

After entry of the court's final judgment, both parties moved to alter or amend with respect to certain items, which motions were granted in part. As thereby amended, the division of assets was as follows:

| Asset | Value | Husband | Wife |
|---|---|---|---|
| Marital home equity | $68,750 | $39,500 | $29,250 |
| Wife's retirement | 7,263 | | 7,263 |
| Wife's IRA | 8,919 | | 8,919 |
| Husband's IRA | 2,810 | 2,810 | |
| "Drew's account" | 7,872 | 3,936 | 3,936 |
| Wife's checking account | 5,995 | 1,495 | 4,500 |
| 2006 Chevrolet Suburban | 21,200 | | 21,200 |
| 2002 Chevrolet Avalanche | 8,760 | 8,760 | |
| Total | $131,569 | $ 56,501 | $75,068 |

The amended allocation of the parties' debts is as follows:

| Debt | Value | Husband | Wife |
|---|---|---|---|
| IRS | $1,033 | $ 517 | $ 516 |
| CADAS | 884 | 884 | |
| Larry Wentworth, LCSW | 250 | | 250 |
| Ron Ashely, LSCW | 500 | | 500 |
| Rodney Susong, MD | 162 | 162 | |
| Mary K. Radpour | 270 | 270 | |
| Total | $3,099 | $1,833 | $1,266 |

In summary, the trial court valued the net marital estate at $128, 470. Husband was awarded $54,668, or 42.5% of the estate, while Wife received $73,802, or 57.5%. This division does not take into account three debts, the allocation of which will be discussed later in this opinion.

## II.

Husband presents the following issues, as taken verbatim from his brief, for our consideration:

> Whether the trial court erred in ordering that [Husband] shall sell the marital residence or pay to [Wife] her share of the equity awarded within 120 days of the entry of its order?
>
> Whether the trial court erred in its distribution of the marital assets and liabilities?

Wife raises the additional issue of whether she is entitled to an award of her attorney's fees incurred on appeal.

## III.

We review the trial court's findings of fact de novo upon the record of the proceedings below, accompanied by a presumption of correctness. We must honor this presumption unless the preponderance of the evidence is against those findings. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). There is no presumption of correctness as to the trial court's conclusions of law. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

The issues raised on appeal involve subjects addressed to the sound discretion of the trial court. *Batson v. Batson*, 769 S.W.2d 849, 850 (Tenn. Ct. App. 1988); *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983); *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995). "An appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). On review of the trial court's discretionary functions, the appellate court looks, among other things, to see whether the evidence preponderates against the court's factual findings in support of its decisions.

IV.

With regard to the marital home, the final divorce judgment provides as follows:

> The River Hills Drive home is awarded to the Husband who will
> be responsible for all expenses relating to that home incurred
> after November 20, 2008. That home is currently on the market
> with a sale price of $325,000.00. If the house is not sold within
> 120 days or if the Husband takes it off the market, the Husband
> must, within 120 days of the date of this Order pay the Wife the
> $29,250.00 which represents her share of the equity in that
> property.

Husband does not take issue with the trial court's distribution of this asset as such. Rather, he challenges the provision that essentially requires him to pay Wife her share of the equity within 120 days. Husband contends that this provision is unreasonable and "causes an unnecessary injury" to him by forcing him to deplete his separate estate if the home does not sell quickly. He points to Wife's "early" departure from the marital home, her purchase of a new home, the general downturn in the housing market, and his own, unsuccessful earlier efforts to sell the home as factors that demonstrate that the provision cannot be achieved within the time allowed. We disagree with Husband's position. The proof shows that, at the time of trial, Husband remained in the marital home and had taken it off the market, indicating an intention to keep the home at least for the time being. In its judgment, the trial court expressly recognized that Husband had a "significant separate estate," and, we think, implicitly found that Husband had the resources to pay Wife her share of the equity within a period of four months regardless of whether he kept or sold the property.

Regarding the distribution of marital property, Tenn. Code Ann. § 36-4-121(a)(3)(2005) empowers the trial court to "effectuate its decree by divesting and reinvesting title to such property and, where deemed necessary, to order a sale of such property and to order the proceeds divided between the parties." Further, the court may, in its discretion, "impose any additional conditions or procedures upon the sale of property in divorce cases as are reasonably designed to ensure that such property is sold for its fair market value." Tenn. Code Ann. § 36-4-121(a)(3)(c). In our view, it was well within the trial court's discretion to effectuate the distribution of the parties' largest marital asset by awarding the home to Husband while ordering that Wife receive her share of the equity within 120 days.

V.

A.

Husband contends that the trial court erred with regard to its classification and allocation of three specific debts: (1) the $50,000 debt owed to Morgan Stanley, evidenced by Husband's promissory note, (2) the fee for treatment Husband received at The Meadows, and (3) a debt owed to Husband's father for the latter's payment of certain marital bills. Husband essentially contends that the failure to classify and apportion these marital debts between the parties renders the overall property division inequitable.

B.

We address the claimed debts in turn, mindful of the trial court's wide discretion in this matter, and aware that the court's goal, in every divorce case, is "to divide the parties' marital estate in a just and equitable manner." *Morton v. Morton*, 182 S.W.3d 821, 833 (Tenn. Ct. App. 2005)(citing *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)). To this end, the trial court is guided by a consideration of the relevant factors set forth in

_____

Tenn. Code Ann. § 36-4-121(c).[2]  ***Kinard v. Kinard***, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998).

## C. Morgan Stanley Note

As we noted earlier, Husband received a $50,000 "bonus" in December 2007 when he joined Morgan Stanley. According to Husband, he deposited the money into his checking account to pay household expenses because the parties had been living above their means for some time. Husband was required to sign a promissory note evidencing his obligation to repay the money he received in yearly installments of $5,555 plus accrued interest beginning

---

[2] Tenn. Code Ann. § 36-4-121(c) provides as follows:

In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

in December 2008 and continuing through December 2016. The terms of the note provide that if Husband leaves the firm or is fired, the outstanding balance becomes immediately due and payable. Along with the promissory note, Husband and Morgan Stanley entered into a bonus agreement whereby each loan installment Husband pays pursuant to the promissory note is to be reimbursed to him on December 27 of that same year provided he is still employed by the firm on that date.

As noted earlier in this opinion, the trial court did not list the promissory note among the marital debt. The trial court explained its allocation of this debt as follows:

> The Husband claims a debt to Morgan Stanley in the amount of $52,200.00.[3] Evidence is the Husband signed a note with Morgan Stanley agreeing to pay this amount back to the company over a nine year period. However, the Husband's agreement with Morgan Stanley is that he will make a payment of $5,555 every December 14, starting December 14, 2008. On December 27 of each . . . [year], he receives a guaranteed bonus which, in effect, repays him the amount he paid to Morgan Stanley. While it is true the Husband may be liable under this note if he quits or is fired by Morgan Stanley, the Court rules this debt, which is contingent upon certain conditions, is the sole responsibility of Husband.

Husband basically argues that the trial court did not treat the note as a marital debt and that it was inequitable to allocate the debt, in its entirety, to him because both parties reaped its benefits. "Marital debts" are defined as "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Marital debts are subject to equitable division in the same manner as marital property. *See Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). In dividing marital debts, courts should consider the following factors: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Id*.

First, we disagree with the Husband's assertion that the trial court failed to treat this debt as a marital one. In discussing the note at the trial, the court correctly observed that "the note is a debt . . . and disputed, but a debt nonetheless." The court never said it was not a marital debt or that it was Husband's separate debt. It simply assigned responsibility for

---

[3]Presumably, this figure includes the initial $50,000 plus accrued interest.

repayment of the note to Husband, finding that the debt was incurred by Husband and that it was Husband who had the ability to ensure that he would be reimbursed for any payments made by him. The evidence does not preponderate against the trial court's finding that it was fair and equitable to allocate all of this debt to Husband.

### D. The Meadows Bill

Husband also sought to have Wife reimburse him "at least half" of the money he paid to The Meadows. In allocating the debt entirely to Husband, the trial court opined as follows:

> Testimony was that the Husband paid the entire bill from his separate estate. The entire bill is approximately $37,000, $7,000 of which was reimbursed to him by an insurance company. The Husband wants to be reimbursed at least one-half of the $30,000 remaining for his treatment at The Meadows. While the Husband claims the sole reason for him going to The Meadows was his discovery of the Wife's actions, the evidence indicates there were other factors involved. The Court rules the Wife is not required to reimburse the Husband money he paid for his treatment at The Meadows.

By Husband's interpretation, the trial court did not classify the debt to The Meadows as a marital debt subject to equitable distribution because it found that the expenditure benefitted only Husband. We note at the outset that we disagree that this was the import of the trial court's findings. Certainly, the services Husband received at that facility arguably benefitted both parties and potentially the marriage itself as well as the parties' children and the trial court made no finding to the contrary. To the extent, if any, that the trial court's findings suggested that a debt must benefit both parties to be considered a "marital" debt, this is not the law. Husband correctly points to *Marciante v. Perry*, M2006-02654-COA-R3-CV, 2008 WL 820502, *10 (Tenn. Ct. App. M.S., filed March 26, 2008), wherein we noted that the "Supreme Court has expressly rejected the notion that a debt must have produced a 'joint benefit' for both parties in order to be classified as a marital debt." Under the test adopted instead, we are required to consider only "whether the debt was incurred during the course of the marriage." *Id*.

Clearly, The Meadows bill is a marital debt. Upon considering the relevant factors, the trial court allocated the $30,000 that was not reimbursed by insurance to Husband, who had already paid the bill in full. In doing so, the court found that Husband incurred the debt to obtain treatment for a variety of issues or problems, only one of which was his discovery

of Wife's indiscretion, and he was able to afford the particular facility he chose to visit only by using his separate funds. We think that, as set out in his brief, Husband's own testimony at trial acknowledged that the responsibility for this marital debt was properly placed with him when he concedes that "[a]s the parties['] marital estate lacked sufficient funds, [Husband] had no alternative but to pay the [$30,000] balance from his separate funds." The evidence does not preponderate against the trial court's findings, or its decision that it was equitable to allocate this debt to Husband.

## E. Debt to Husband's Father

At trial, Husband testified that he told Wife before he left for The Meadows that she would need to make sure that their home and auto insurance policy premiums were paid while he was away. However, when Husband called Wife from Arizona, she advised him that she did not have the money to pay these bills. As a result, Husband arranged for his father to pay the $500 bill for the parties. The trial court allocated to Father any debt owed to Husband's father. As with the other debts we have discussed, the evidence does not preponderate against the trial court's implicit finding that, as between the parties, Husband should repay this debt.

In the end, Husband would be responsible for a total of $84,532.50, or 98.5% of the marital debts, which we find to be equitable considering that over $82,000 of this amount is the result of Husband's loan/bonus arrangement with his employer and The Meadows bill that Husband had incurred and paid with his separate funds. As discussed, we think that the allocation of these two marital debts to Husband was fair and equitable under the facts of this case.

After considering the Trial Court's overall property distribution in light of the various factors set forth in Tenn. Code Ann. § 36-4-121(c), we are unable to conclude that the property distribution was inequitable or that the Trial Court erred in its allocation of the marital debts.

## VI.

Wife contends that all of the issues Husband has raised on this appeal are frivolous. Therefore, she requests that she be awarded her attorney's fees and the costs she incurred in being forced to respond to the appeal. "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed.'" *Morton v. Morton*, 182 S.W.3d 821, 838 (Tenn. Ct. App. 2005)(quoting *Industrial Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)). We decline to

characterize the appeal as frivolous and therefore also decline to award Wife her attorney's fees and other costs of this appeal.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Edward Joseph Warwick, Sr. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE