IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2019 Session

## LI HUANG SULLIVAN v. ERIC JASON SULLIVAN

**Appeal from the Chancery Court for Williamson County**
**No. 45851     James G. Martin, III, Judge**

_____

**No. M2018-01776-COA-R3-CV**

_____

This appeal is from a final decree of divorce. The Husband challenges several of the trial court's rulings regarding the parenting plan, division of the marital estate, calculation of child support, and denial of his motion to amend to file a counterclaim for alimony. For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Stanley A. Kweller, Nashville, Tennessee, for the appellant, Eric Jason Sullivan.

Helen Sfikas Rogers, Siew-Ling Shea, and Gene F. Guerre, Nashville, Tennessee, for the appellee, Li Huang Sullivan.

### OPINION

#### I.     FACTS & PROCEDURAL HISTORY

Li Huang Sullivan ("Wife") and Eric Jason Sullivan ("Husband") were married in October 2005. They have two minor children, a seven-year-old daughter ("Daughter") and a five-year-old son ("Son").[1] Throughout most of the marriage, Wife worked as a mortgage banker, and Husband worked as a nurse. The parties' income varied during the course of the marriage.

_____

[1] The ages noted are the ages of the children at the time the divorce complaint was filed. The parties also adopted Wife's nephew, who was an adult at the time of the divorce proceedings.

After eleven years of marriage, Wife filed a complaint for divorce in January 2017, alleging irreconcilable differences and inappropriate marital conduct. In March 2017, Husband filed an answer but did not assert a counterclaim. Wife subsequently filed a motion for *pendente lite* "child and family support." After a hearing, Husband was ordered to pay "family support" in the amount of $1,000 per month, beginning August 1, 2017. The court further ordered that each party would be responsible for continuing to pay his or her respective expenses, as listed on the exhibits they filed with the court. However, the court declined to require Husband to pay any portion of the children's private school tuition and reserved the issue for the final hearing.[2]

Throughout the majority of 2017, the parties engaged in ongoing discovery and filed several pretrial motions. Husband filed a motion for a temporary restraining order, alleging that Wife was alienating him from the children.[3] Subsequently, Wife filed a motion for drug testing, alleging that Husband used illegal steroids. Wife also had a subpoena issued requesting production of Husband's pharmacy records.[4] Husband then filed a motion for a protective order and to quash the subpoena. However, he later admitted that the motion was filed in an effort to prevent discovery of his dishonesty in sworn statements made throughout the proceeding. The trial court entered an order in November 2017, granting Wife's motion for drug testing. In December 2017, the trial court entered an order denying Husband's motion to quash and temporary restraining order.

In February 2018, Wife was permitted to amend her complaint to allege that Husband committed adultery. Along with Wife's amended complaint, she submitted a proposed parenting plan. The plan suggested that she be designated as the primary residential parent and receive 237 days of annual parenting time, and that Husband receive 128 days.

Husband filed an amended answer to the amended complaint, but again asserted no counterclaim. Husband admitted that he engaged in extramarital relations approximately one year prior to the filing of the divorce. Shortly thereafter, Husband filed a proposed permanent parenting plan. Husband's plan proposed that he be designated as the primary residential parent and receive 261 days of parenting time, and that Wife receive 104 days.

On Thursday, March 29, 2018, the trial court held a pretrial conference. At that time, the parties discussed the joint statement of assets and liabilities and the expectations

---

[2] It is undisputed that the parties had agreed prior to the filing of the divorce that the children would attend private school. The children had been attending private school since enrollment age.

[3] Husband's basis for a claim of alienation was Wife's alleged failure to notify him regarding activities for the children and that she had taken Daughter to a pediatrician without his knowledge.

[4] Wife contends that the basis for the subpoena was due to finding drug paraphernalia in the home.

for the upcoming trial the following week. The next day, after the clerk's office had closed, Husband faxed an emergency motion for leave to file a counter-complaint.[5] Husband requested that he be allowed to assert a claim for alimony.

Wife opposed Husband's motion and filed a response and memorandum of law in opposition. Husband's motion was heard on the first day of trial.[6] The trial court denied Husband's motion, finding *inter alia* that the "divorce had been pending for 15 months" and "to allow Husband to amend his pleadings two days before trial would be unduly prejudicial to Wife." The court also approved a stipulation on assets belonging to third parties and a stipulation of an amended joint statement of assets and liabilities, filed by the parties. The parties agreed to the valuation of the parties' assets and liabilities with the exception of the marital home and certain vehicles owned by the parties. Although the parties largely agreed on the valuation of their assets and liabilities, they did not agree as to the equitable division of the marital estate.

The divorce was tried over five non-consecutive days. During the course of trial, the court heard a substantial amount of testimony. The record contains over eight hundred pages of testimony from various individuals, along with evidentiary depositions and numerous exhibits. Much of the testimony focused on the care of the children, both prior to and after the filing of the divorce.

Two months after the last date of trial, the court entered an interlocutory order, finding that Husband engaged in inappropriate marital conduct and addressing the division of assets and debts, along with interim parenting time for the parties.[7] The stated purpose of the interlocutory order was to allow the parties to "make plans for themselves and their children," while the court completed a comprehensive memorandum and order that would address all issues. Shortly thereafter, an agreed order was entered modifying the summer parenting time.

On July 11, 2018, the trial court entered a memorandum and order, containing more than eighty pages, with detailed findings of facts and conclusions of law. The order thoroughly discussed the testimony of various witnesses, the credibility of the parties, and the concerns of the court.[8] The court divided the parties' assets and debts in a manner the

---

[5] The "FILED" date on the motion indicates it was filed on March 29, 2018. However, the trial court's order from the April 2, 2018 hearing, the statements from Husband's counsel at the hearing, and the fax date at the top of the motion indicated it was filed on March 30, 2018.

[6] The first day of trial was April 2, 2018, in accordance with a pretrial order entered on November 14, 2017.

[7] Husband stipulated to the ground of adultery. He also stipulated to the ground of inappropriate marital conduct, but only to the extent that adultery is inappropriate marital conduct.

[8] We will further discuss the testimony of various witnesses and specific findings of the trial court in conjunction with the specific issue raised.

court deemed equitable. Wife was awarded $717,129.90 in marital assets and Husband was awarded $591,904.17 in assets.

In formulating the parenting plan, the court analyzed the evidence and applicable statutory factors. Wife was named the primary residential parent and granted sole decision-making authority for the children regarding education, non-emergency health care, and religious upbringing.[9] Husband and Wife each had decision-making authority for the children regarding extracurricular activities. The residential parenting schedule provided for Husband to exercise parenting time with the children: (1) every other weekend from 5:00 p.m. on Friday until 5:00 p.m. on Sunday;[10] (2) 5:00 p.m. until 7:00 p.m. on Thursday following the weekend when he exercised parenting time and Tuesday of the week that he did not exercise weekend visitation; (3) alternating holidays and school breaks; and (4) alternate weeks during the summer, with Husband receiving the first week of each summer. The plan allocated 269 days to Wife and 96 days to Husband.

Child support was calculated based upon the parties' gross monthly income. Included in the child support worksheet were work-related childcare expenses and expenses for the children's private education. The children had attended a private school throughout the parties' marriage. Daughter had a learning disability, along with other diagnoses, which required special services to meet her educational needs. The trial court ordered that Wife could choose the school she deemed appropriate for the children. Wife elected to enroll Daughter in Currey Ingram Academy, and the cost for Daughter's tuition ($41,397 annually) was included in the child support worksheet. Son attended Christ Presbyterian Academy, where the tuition was $14,433 per year. Husband was ordered to pay Wife $2,032.97 per month in child support. The child support calculation included an $883.97 upward deviation for Husband, to reflect his nineteen percent (19%) *pro rata* share for both children's private education.

Wife requested an award of attorney's fees, which was denied by the trial court. After entry of the memorandum and order, both Husband and Wife filed motions to alter or amend the order. Wife requested the court reconsider her request for attorney's fees and expenses. Husband requested modifications in his parenting time, child support, and division of the marital assets and liabilities. The court entered an order denying both parties' motions to alter or amend. Husband timely filed a notice of appeal.

## II.   ISSUES PRESENTED

---

[9] The parenting plan designates that Wife has decision making authority regarding religious upbringing. However, in the decision making section of the permanent parenting plan, it also states: "[e]ach parent may make decisions pertaining to religious upbringing when the children are with them and in their care."

[10] The trial court also found that if Husband's work schedule allowed, he was authorized to pick up the children from school rather than waiting until 5:00 p.m.

Husband presents the following issues, as we perceive them, for review on appeal:

1. Whether the trial court erred in determining that Wife should be designated the primary residential parent;

      a. Whether the trial court erred in awarding Husband less parenting time than Wife suggested in her proposed permanent parenting plan;

      b. Whether the trial court abused its discretion by awarding Husband less parenting time as a form of punishment for Husband's dishonesty;

2. Whether the trial court erred in determining the amount of child support awarded;

      a. Whether the trial court erred in ordering that Husband pay a pro rata share of the children's "work-related childcare" and private educational expenses;

3. Whether the trial court erred in its division of marital assets;

4. Whether the trial court erred in denying Husband's motion to amend to file a counterclaim for alimony.

In the posture of appellee, Wife seeks an award of attorney's fees for trial and on appeal. For the following reasons, we affirm the decision of the chancery court.

### III. DISCUSSION

#### A. Standard of Review

Generally, in non-jury cases, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review questions of law de novo, attaching no presumption of correctness to the trial court's legal conclusions. *Armbrister*, 414 S.W.3d at 692 (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002)).

Notably, however, our specific standard of review depends, in large part, on the issues that the parties have presented to this Court. Consequently, we will discuss each applicable standard of review in correlation with the issue presented.

#### B. Permanent Parenting Plan

Husband raises several issues regarding the trial court's formulation of the permanent parenting plan. The Tennessee Supreme Court has repeatedly emphasized

- 5 -

"the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017). The Court stated: "the appropriate standard of 'review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise.'" *Id*. (quoting *Armbrister*, 414 S.W.3d at 692-93). The Court reasoned that:

> [T]rial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. [*Armbrister*, 414 S.W.3d] at 693 (citing *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Id.* (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

*Id*. at 495. Furthermore, a trial court abuses its discretion when its ruling "'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge*, 42 S.W.3d at 88).

Here, Husband argues that the court abused its discretion in naming Wife as the primary residential parent and allocating him less parenting time than suggested by Wife. The core of Husband's argument is that the trial court made its decision to punish him for testifying falsely throughout the proceedings.[11] Respectfully, we find this argument somewhat disingenuous. Husband does not cite any specific references to the record to support that argument, but merely speculates that the trial court's overall formulation of the parenting plan served as a consequence for his dishonesty.[12]

It is apparent from the record that Husband and Wife cannot agree on how best to parent the children. The parents agreed at trial that the court must designate a "captain of the ship." Therefore, the court was tasked with the responsibility of formulating a permanent parenting plan. Creating a parenting plan "is one of the most important responsibilities courts have." *Armbrister,* 414 S.W.3d at 696. As explained by this Court,

---

[11] Husband admitted at trial that he lied several times under oath because he was fearful of the impact that the truth regarding some of his behaviors would have on the case.

[12] Rule 6 of the Tennessee Rules of the Court of Appeals requires an appellate brief to contain a written argument in regard to each issue on appeal, with a statement of the alleged erroneous action of the trial court, as well as a *specific reference* to the record where such action is recorded.

"[t]rial courts must be able to exercise broad discretion in these matters." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996).

### i. Primary Residential Parent and Residential Schedule

In the development of a parenting plan, the court is required to determine a residential schedule, which designates a primary residential parent. Tenn. Code Ann. § 36-6-402(5). The trial court must consider the factors listed in Tennessee Code Annotated section 36-6-106(a)(1)-(15) to ascertain the best interest of the child, in determining a residential schedule and naming a primary residential parent.[13] *See* Tenn. Code Ann. § 36-6-404(b); Tenn. Code Ann. § 36-6-106(a). The factors set forth in Tennessee Code Annotated section 36-6-106(a), are as follows:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

---

[13] The court shall consider the factors found in section 36-6-106(a)(1)-(15), if "the limitations of § 36-6-406 are not dispositive of the child's residential schedule." Tenn. Code Ann. § 36-6-406(b). The trial court ruled that § 36-6-406 did not apply to the case. Additionally, Husband and Wife do not argue that any restrictions in § 36-6-406 are applicable to the facts of this case.

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)-(15). In determining a child's best interest, it is incumbent upon the court to fashion a parenting plan that allows each parent to enjoy the maximum participation possible in the life of the child consistent with the applicable statutory factors. Tenn. Code Ann. § 36-6-106(a).

Turning back to the case before us, the record reveals that the trial court conducted a thorough and unbiased assessment of the evidence presented. In designating Wife as the

primary residential parent and allocating parenting time to each party, the trial court considered the applicable statutory factors, ruling as follows:

1. The evidence establishes that both parents have a strong, loving, and stable relationship with the children. Since shortly after [Son's] birth, the parents have engaged the services of a nanny who has provided for the children's day-to-day needs from the time they get up in the morning until one or both parents arrive in the evening. The nanny provided services Monday through Friday each week, during vacations, and other times when necessary. Both parents were engaged in the decision to employ their first nanny, terminate the services of their first nanny, and employ their second nanny, who currently provides for the children on a day-to-day basis. Prior to the filing of the complaint for divorce, when the nanny needed to consult with the parents, Mr. Sullivan was available more often because of his work schedule. The same is true when there was a need to communicate with a teacher or a health care provider. Since January 2017, both parents have been fully engaged in communicating with the children's nanny, their teachers, and health care providers.

Prior to January 2017, Ms. Sullivan often arrived home after the nanny departed, which was generally at 6:00 p.m. Mr. Sullivan would provide care for the children until Ms. Sullivan's arrival. Both parties provided care for the children on weekends. On occasion, however, Ms. Sullivan worked from home and Mr. Sullivan would be responsible for caring for the children during that time if the nanny was not present or available. Ms. Sullivan and the nanny provided care for the children when Mr. Sullivan traveled.

2. Both parents have demonstrated a history of performing parental responsibilities. They mutually decided to provide a private education for their children. They mutually agreed on daycare, pre-kindergarten, kindergarten, and elementary school facilities. When it became evident that [Daughter] was not able to cope with the demands of the regular classroom environment at Christ Presbyterian Academy, the parties disagreed on her placement. [Daughter] was tested both before and during the divorce proceedings. Based on the results of the testing, the recommendations of the teachers, and each parent's investigation, Ms. Sullivan decided to enroll [Daughter] in the Foundation Christian Academy home school program and the i-Hope Tutorial Program. Mr. Sullivan preferred to enroll [Daughter] at Grassland Elementary School. Mr. Sullivan acknowledges that part of his motivation is the cost associated with continuing [Daughter's] education at Foundation Christian Academy and i-Hope. Similarly, both parties visited Curry-Ingram Academy [sic], a school designed to meet the individual

needs of special education students. At the time of trial, neither party had made any decision as to whether enrolling [Daughter] at Curry-Ingram Academy [sic] would be beneficial. Mr. Sullivan continued to advocate for Grassland Elementary School, a school that is part of the Williamson County School district.

Selecting an educational institution for each child, when it is within the parents' ability to pay the cost of that institution, is one of the most important exercises in parental responsibility. It is evident to the Court that Ms. Sullivan is willing to work as hard as it takes to provide for [Daughter] and [Son's] education. On the other hand, Mr. Sullivan is content with pursuing his current occupation, which also affords him the luxury of working out two hours a day in the gym.

Further, the Court is required to look at the willingness of each parent to facilitate and encourage a close and continuing parent-child relationship between the other parent and the children. There is no evidence that Ms. Sullivan has done anything prior to or since the divorce that would disrupt the relationship between Mr. Sullivan and the children. In fact, the evidence establishes that after Ms. Sullivan filed her Complaint for divorce, Mr. Sullivan turned the parent-child relationship into a contest between himself and Ms. Sullivan. He has needlessly involved law enforcement in two incidents at the parties' home, both of which frightened the children. In addition, Mr. Sullivan engaged in the childish conduct of videotaping [Daughter] while at the same time encouraging [Daughter] to falsely accuse Ms. Sullivan of slapping her after the incident when [Daughter] poured Sprite over her brother in the automobile on the way home. Further, Mr. Sullivan complained to Ms. Stewart [Daughter's tutor] about alleged domestic violence while in front of [Daughter]. This was after he already told [Daughter] and [Son] that Ms. Sullivan was "dangerous" during the course of the "Sprite" incident.

It was acknowledged at trial by the parties, the nannies, [Daughter's] teachers, and others that [Daughter] is not an honest child and for Mr. Sullivan to encourage further dishonesty is of great concern to the Court. Mr. Sullivan's behavior is a detriment to the children's relationship with Ms. Sullivan. His dishonesty and his willingness to encourage the children to be dishonest do not serve any purpose other than to promote his own self-interest. It remains to be seen whether Mr. Sullivan will honor and facilitate the Court-ordered parenting arrangements and rights. The Court has full confidence that Ms. Sullivan will do so.

3. Both parties have attended the parent education seminar.

4. Both parties have demonstrated a disposition in the past to [e]nsure that [Daughter] and [Son] are well fed, well clothed, and are provided excellent medical care, education, and other necessary care. The Court has full confidence that Ms. Sullivan will continue to do so and believes that Mr. Sullivan will do so, if it is within his chosen economic ability.

5. The parties have relied in large measure on their nanny to perform parental responsibilities. Since the divorce proceedings began in January 2017, both parties have actively engaged with the nanny, the children's teachers, and the children's health care providers. Prior to the institution of divorce proceedings, Mr. Sullivan was more available than Ms. Sullivan was when the need arose to address issues involving the children.

6. Both parties have strong love, affection, and emotional ties with the children.

7. The evidence establishes that [Son] is a normal, well-developed child. He is doing well in school. He participates in a number of extracurricular activities. On the other hand, [Daughter] is severely challenged. She suffers from ADHD and dyslexia. She cannot matriculate in a normal classroom. She is overwhelmed by the stimuli she experiences in such a setting.

Most importantly, however, as the experts who have tested [Daughter] have characterized it, [Daughter] is in great need of routine, discipline, and consistency. The Court heavily relied on the reports and/or the experts' testimonies in coming to its conclusions regarding [Daughter's] education and the allocation of parenting time. The Court believes that a consistent, stable routine is in [Daughter's] best interest, especially during the school year. Both parents recognize [Daughter's] deficiencies. However, the parents have very different views on how those deficiencies should be addressed. Mr. Sullivan embraces the notion that [Daughter] should be medicated. Ms. Sullivan opposes medication because of the side effects that can result but will agree to the use of medication if recommended by [Daughter's] health care provider. The immediate and future challenges for [Daughter] are significant. The Court finds that Ms. Sullivan is better equipped to meet those challenges.

8. The Court is very concerned about Mr. Sullivan's moral, mental, and emotional fitness as it relates to his ability to parent the children. The Court's concern has nothing to do with Mr. Sullivan's sexual orientation. Throughout the course of the trial, Mr. Sullivan was very emotional. He was emotional in discussing his dishonesty. He was emotional in discussing

the children. Yet, Mr. Sullivan did not seem to engage in the same kind of emotional struggle when he lied in his answers to interrogatories. He was not concerned when he lied in his responses to questions at his deposition or when he lied to his mother about his infidelity, and when he lied on numerous occasions during his trial testimony. He was not bothered when he engaged in sexual activity that might expose him or potentially expose his wife to HIV by engaging in sexual relations with her without disclosing his prior conduct. He did not fret when he started taking medication to prevent HIV without disclosure to his wife or when he encouraged [Daughter] to lie regarding her mother's conduct when [Daughter] was disciplined for pouring Sprite over her brother in her mother's car. He attempted to portray himself as a victim when he engaged law enforcement at the parties' home when Ms. Sullivan had done nothing to warrant involvement by the police. He has also attempted to garner support from third parties such as when Mr. Sullivan had the conversation in front of [Daughter's] tutor accusing Ms. Sullivan of being violent toward him. He has exhibited controlling behaviors such as when he placed a tracking device on his wife's vehicle for several months for no discernible reason or when he requested the children's teachers forward all communications to him while leaving Ms. Sullivan out of those same communications. Mr. Sullivan has refused to correct the children's bad behavior such as when he allows [Daughter] to walk around the house naked and use the "F" word. Further, it is concerning that Mr. Sullivan regularly went about the house and slept with the children in nothing but a tight bikini type garment, and only stopped the behavior after the counselor told him to stop.

The Court is also concerned by some of Mr. Sullivan's other behaviors. First, Mr. Sullivan kept his needles and illegal drugs in his bathroom cabinet where the children could reach them and not put them in the garage refrigerator as suggested by Ms. Sullivan. Second, he left his sex toy where [Son] could find it and start playing with it. Third, Mr. Sullivan watched sexually explicit movies easily accessible by the children on Netflix. The foregoing evidence, together with the other evidence introduced at trial, supports the conclusion that Mr. Sullivan has no moral compass to aid him in his desire to be the primary residential parent and/or role model for the parties' children. There was no credible evidence of similar complaints about Ms. Sullivan.

9. The evidence establishes that the relationship between [Daughter] and [Son] is a fairly normal brother/sister relationship. The children have a strong relationship with their paternal grandmother, Ms. Chambless. Ms. Sullivan also has a strong relationship with Ms. Chambless. Each child has a group of friends drawn from their school, neighborhood, and other

activities. The Court anticipates that the children will continue with these relationships.

10. The divorce has been disruptive to the children, as would normally be expected. Once the parties physically separate, the Court anticipates further disruption. Accordingly, it is incumbent on the Court to fashion a parenting plan that will provide the children as much continuity as possible in relation to their current living and educational circumstances.

11. The Court does not find that either child has been physically or emotionally abused.

12. There is no evidence that the character or behavior of any person who resides in or frequents the home of the parents, other than the parties' nanny, has had any influence on the children. The Court does not find either of the parties' nannies has had a negative influence in the children.

13. Given the age of the children, this factor is not applicable.

14. Once Ms. Sullivan began her employment at CapStar on April 1, 2014, her schedule became more flexible, albeit demanding. She has been able to work in a high pressure, stressful environment and maintain a calm and deliberate demeanor. However, Ms. Sullivan has worked long hours and has often worked from home. Mr. Sullivan's work has required that he travel on occasion. He has been able to minimize his travel in the months leading up to the divorce trial. Otherwise, Mr. Sullivan's work schedule affords him the opportunity to exercise at a gym approximately two hours each day. The uncorroborated proof from Mr. Sullivan is that he has received good reviews in his work performance. The nannies have taken the children to visit Mr. Sullivan at the gym during the time that he was exercising and Mr. Sullivan has taken the children to the gym with him on occasion when he was exercising. He would leave them in the gym's daycare facility. The nannies have also taken the children to Ms. Sullivan's work place to visit with her on occasion during work hours. In fashioning the parenting plan, the Court does not find any accommodations necessary to meet the employment needs of either parent.

15. The Court finds no other factors to be relevant in establishing a permanent parenting plan.

After an extensive review of the record, we agree with the findings of the trial court. The findings were wholly supported by the evidence presented at trial and the entirety of the record. Notably, Husband does not argue that the factual findings of the

trial court were inaccurate. Rather, he argues that the findings show that the trial court punished him for his admitted dishonesty. We cannot agree.

First, Husband broadly takes issue with the trial court's designation of Wife as the primary residential parent and the allocation of parenting time. The arguments he makes to support his position are: (1) he was the "primary residential parent" prior to the filing of the divorce, (2) Wife proposed thirty-eight more days of parenting time than the trial court awarded him; therefore the trial court's reduction in his parenting time "is evident punishment . . . for [Husband's] misstatements and dishonesty[,]" and, (3) the trial court's best interest analysis supports him receiving more parenting time. The core of each of these arguments is that the trial court became "overwhelmed" with his dishonesty and abused its discretion by improperly giving more weight to his moral, mental, and emotional fitness as it relates to his ability to parent the children. Husband does not dispute that the trial court may consider his credibility in its analysis. He concedes that the trial court correctly found that he had lied to the court on multiple occasions. While Husband acknowledges his deceitful actions, he requests this Court find that the trial court abused its discretion by punishing him for such actions. We decline to do so.

In the court's analysis of the first statutory factor concerning "[t]he strength, nature, and stability of the child's relationship with each parent . . .[,]" the trial court found that, prior to the divorce, Husband was the more available parent at times. Husband contends that such finding supports a conclusion that he was the primary caregiver. The Husband's mother, Daughter's teacher, the nannies, and even the parties themselves, testified that both Husband and Wife were involved in the daily care of the children. While it is correct that Husband's work schedule allowed him to be more present in the children's daily routines, it was also evident that Husband preferred to be one that made everyday decisions regarding the children.

Husband now asks this Court to construe the facts to find that his actions prior to the divorce entitle him to more parenting time. The record is clear that Wife did work long hours to be the primary financial contributor for the family, while Husband handled the daily needs of the children. However, despite the parents' respective roles, the record does not support a conclusion that either parent was absent from the children's lives or more involved than the other. To the contrary, the record establishes that both parents substantially contributed to the overall care of the children. A large amount of testimony was elicited from teachers and experts regarding the actions the parents had taken to ensure the special educational needs of Daughter were met, counseling was set-up for the children, and that the children participated in extracurricular activities. The children were afforded these opportunities because of the involvement of both parents, whether it was financially, emotionally, or physically.

Husband next argues that the trial court's allocation of parenting time is evidence that he was being punished for his dishonesty. Husband contends that because Wife

proposed that he receive more parenting time than the trial court awarded, the trial court was undoubtedly punishing him for testifying falsely. Husband's argument is nothing more than mere speculation. He makes no references to the record to support this contention. We remind Husband that, "[t]he weight, faith, and credit to be given the witnesses' testimony lies in the first instance with the trier of fact . . . ." *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). Furthermore "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill*, 936 S.W.2d at 631. As such, it was entirely permissible for the court to consider Husband's credibility in its analysis. The trial court found that Husband was not credible and specifically referenced his lack of credibility in addressing statutory factors two and eight in Tennessee Code Annotated section 36-6-106.

When fashioning the parenting schedule, the trial court weighed the factors discussed above, and concluded that the children should be with Wife during the school year. Specifically, in reference to Daughter's educational needs, the court found that she needed a "consistent, reliable, and predictable routine." The court reasoned that, based upon Daughter's school reports and the testimony of various witnesses, a consistent schedule was necessary for her academic progress. To achieve consistency for Daughter, the trial court found that she would need to reside with Wife, in the same residence, during the school year. The trial court allocated parenting time in a fashion that it determined would provide the children with the most consistency, while still allowing Husband to enjoy frequent contact with the children. This finding refutes Husband's argument that his parenting time was reduced as a form of punishment. The trial specifically stated:

> [T]he children need frequent contact with their father as well. Because of the differences between the parents, the Court does not believe that [Daughter] will be able to experience the same kind of consistency needed for her academic performance if she is not in the same residence during the school year when the need for such consistency is most critical. However, in addition to the frequency of contact with Mr. Sullivan through the day-to-day schedule fashioned by the Court, Mr. Sullivan will also have the right to attend all of the children's extracurricular activities, their school functions, and interact with the children in similar settings as part of his parenting rights. They will simply not be sleeping at his residence as often as they are sleeping at Ms. Sullivan's residence.

Summarily, we do not find that the evidence preponderates against the trial court's findings. Again, while we understand that Husband is unsatisfied with the trial court's decision, we reiterate that:

> It is not the function of appellate courts to tweak a visitation order in the

hopes of achieving a more reasonable result than the trial court. Appellate courts correct errors. When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See State v. Franklin,* 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf. State v. Pappas,* 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); *Bradford v. Bradford,* 51 Tenn. App. 101, 364 S.W.2d 509, 512-13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g., State ex. rel Vaughn v. Kaatrude,* 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Eldridge*, 42 S.W.3d at 88. The trial court was tasked with the responsibility of formulating a parenting plan that was in the best interest of the children. After reviewing every document in the voluminous record and considering Husband's arguments, we cannot say the trial court abused its discretion. We decline to modify the decision of the trial court for the simple purpose of achieving a result that favors Husband.

### ii. Child Support

We next turn to the trial court's calculation of child support, specifically the issue of work-related childcare expenses and extraordinary expenses. Husband argues that expenses for work-related childcare and the cost of the children's private education should not have been included in the child support calculations. Alternatively, he argues that the work-related childcare costs were not "reasonable" expenses.

The child support guidelines address work-related childcare expenses. The guidelines provide that "additional expenses" for "work-related childcare shall be included in the calculations to determine child support" and "shall be divided between the parents pro rata based upon the [percentage of income] of each parent to determine the total Presumptive Child Support Order and shall be included in the written order of the tribunal together with the amount of the [basic child support obligation]." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(1), (3). "Work-related childcare" costs are defined as: "expenses for the care of the child for whom support is being determined which are due

to employment of either parent or non-parent caretaker." Tenn. Comp. R. & Regs. 1240-02-04-.02(29)(a). Accordingly, childcare expenses must be "appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(c)(1).

In contrast, "extraordinary educational expenses," including "private elementary and/or secondary schooling," are considered as a deviation from the standard child support amount, rather than an additional expense. Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d) & (d)(1)(i). A deviation for extraordinary expenses is determined on a "case-by-case basis," and it is within the discretion of the trial court to determine whether such expenses should be "added to the presumptive child support." *See id*.; *Beyer v. Beyer,* 428 S.W.3d 59, 74 (Tenn. Ct. App. 2013) ("A trial court may order an upward deviation from the Guidelines for extraordinary educational expenses which include tuition and other expenses associated with private school attendance.").

Similar to work-related childcare expenses, the education expenses must be "appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(i). As recently explained in *Vance v. Vance,* No. M2017-00622-COA-R3-CV, 2018 WL 1363323, at *5 (Tenn. Ct. App. Mar. 16, 2018), the guidelines instruct the trial court to make "written findings" if a deviation is awarded. The trial court's order must include:

> 1. The reasons for the change or deviation from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and
>
> 2. The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and
>
> 3. How, in its determination,
> (i) Application of the Guidelines would be unjust or inappropriate in the particular case before the tribunal; and
>
> (ii) The best interests of the child for whom support is being determined will be served by deviation from the presumptive guideline amount.

*Id*. at *5-6 (citing Tenn. Comp. R. & Regs. 1240-02-04-.07(1)(c)). Furthermore, "[i]f a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(iii).

- 17 -

Here, the record contains evidence regarding the parties' income, the work-related childcare expenses, and the cost for the children's private education. As to income and earning capacity, the trial court found that Husband was forty-five years old, and Wife was forty-one years old. Husband and Wife began their marriage with similar salaries and relatively no debt. Wife testified that her income had substantially increased from $60,000 at the beginning of the marriage to over $300,000 at the time of trial. Husband worked as a nurse, having obtained a master's of science degree in nursing, with a specialty in neonatal intensive care. He was employed as a clinical quality improvement specialist. His salary was approximately $91,000 a year. Wife testified that although her income had increased, Husband also had opportunities to increase his income. She testified that Husband had the ability to advance his career by taking the exam to be a licensed nurse practitioner. However, Husband chose not to take the exam and testified that he no longer meets the criteria to become a neonatal nurse practitioner.

Notably, the parties do not dispute their respective incomes as reflected on the child support worksheet entered with the permanent parenting plan. Wife's monthly salary was reported as $32,120.83 and Husband's was $7,590.83. The trial court also found that work-related childcare expenses for the parties' nanny and extraordinary expenses for the children's private education should be included in the child support worksheet. Additionally, the trial court found each party would be responsible for their respective pro rata share. The parties agreed that the monthly cost of the nanny was $2,770.67. During the trial, neither party disputed the reasonableness of this fee. However, after trial, Husband argued in his motion to alter or amend that "such nanny is not reasonable work-related childcare." He further argued that such an expense was unnecessary based upon the children's ages and full-time school enrollment. He maintains that argument on appeal, suggesting that the nanny expense is both unnecessary and unreasonable.

In reviewing the trial court's findings regarding the work-related childcare expenses, we find no error. The trial court appropriately found that the children had enjoyed the services of a nanny since Son was six months old. Further, prior to disposition of the case, both parties relied heavily on a nanny for the daily tasks for the children. There is nothing in the record to indicate that Husband is unable to pay his pro rata share of the cost or that such expense is unreasonable. Additionally, the record is devoid of any evidence that would suggest that the parties intended to forego the use of a nanny, had they remained living together. The trial court properly included the expenses in the child support worksheet pursuant to the guidelines.

As to the children's private education, the parties testified to each child's academic progress. Testimony was elicited from one of Daughter's teachers, and numerous exhibits were introduced, including an evidentiary deposition and the children's school records. At the time of trial, Son was completing kindergarten at Christ Presbyterian Academy ("CPA"), a private school. The parties testified that the annual

tuition for CPA was $13,005. Daughter was completing second grade through a home school program, Foundation Christian Academy and "i Hope."[14] The tuition for Foundation Christian Academy was $3,000 and "i Hope" tutoring cost was $20,412. The testimony presented at trial indicated that Son was thriving at CPA. However, Daughter had several diagnoses that hindered her educational progress. She had two psychoeducational evaluations and other testing to measure her cognitive, academic, and behavioral functioning. Daughter tested in the one percentile in many areas. She was diagnosed with dyslexia and attention deficient hyperactivity disorder. The evidentiary deposition of Shanna J. Reece, Ph.D., was introduced as an exhibit at trial. Dr. Reece opined that Daughter needs a structured environment with specific routines. She further testified that Daughter's limitations could lead to frustration and behavioral problems.

Jodie Stewart, a teacher for Daughter, testified regarding Daughter's educational needs and progress.[15] She characterized Daughter as being loving, thoughtful, and artistic. However, she indicated that Daughter can be "manipulative" like many children and adults. Ms. Stewart explained that there have been times that Daughter would fabricate stories. Ms. Stewart would correct Daughter; however, she explained that Daughter would acknowledge the wrong and then she would forget and repeat the action. As to Daughter's continued educational needs, Ms. Stewart did not believe public school was the best option. When asked if Daughter would be able to handle a public school environment, she stated: ". . . I think putting . . . [Daughter] back into a lion's den, if you will, for where she's at, I think it would be extremely detrimental."

Despite Dr. Reece's and Ms. Stewart's opinions, Husband and Wife had different proposals for the children's continued education. Husband testified that he believed public school was an option for both children. Wife did not agree that public school would meet the needs of the children. As for Daughter, Wife was unsure what private educational program would be best. She and Husband had explored placing Daughter at Currey Ingram Academy, a school designed to meet the individual needs of special education students. Both parties had toured the school and spoken with school personnel prior to trial; however, a decision had not been made regarding enrollment. Wife testified that, at the time of trial, the tuition for Currey Ingram Academy was $39,000 per year. Based upon the parties' income, Husband's pro rata share for the children's private education was nineteen percent and Wife's was eighty-one percent. The trial court found that Husband offered "no credible evidence" to support his position that the children

---

[14] Foundation Christian Academy is a home school program under the umbrella of Christ Presbyterian Academy. "i Hope" is a special learning center that provides educational services for children, using a specialized program. It is unclear from the record as to the precise name of "I Hope" as it is referenced throughout the record as "I Hope," "i-Hope," "ihope," or "i hope."

[15] Ms. Stewart is a speech-language therapist as well as a reading specialist. She is the owner of "i Hope" and teaches students with dyslexia and other disabilities. She has thirty-five years of experience in teaching children in both private and public educational settings.

should attend public school. The court found of importance that the parties had made the decision for their children to attend a private school prior to the divorce.

The trial court found that Son had done well at CPA; however, from the evidence presented, it found that Daughter thrived best in a "one-on-one" learning environment. The trial court concluded that the parties had the financial ability to afford private education for the children and that the children should remain in a private school. Specifically, the trial court found that Son would continue his education at CPA and Daughter would continue her education at "i-Hope and Foundation Christian Academy, *or any other education facility*," chosen by Wife. (emphasis added). A deviation for extraordinary educational expenses was awarded and included in the child support worksheet and permanent parenting plan. The child support worksheet reflects that the cost for Son's tuition, at CPA, was $14,433 annually, and Daughter's tuition, at Currey Ingram Academy, was $41,397 annually.

Husband argues that the trial court erred in allowing Wife "to select a school which is the most expensive private school in the Middle Tennessee area for one of the parties' minor children . . . ." Notably, Husband does not raise any arguments regarding the tuition costs for Son at CPA. Further, he does not challenge Wife being designated as the sole decision-maker for the children's education. Rather, he centers his argument on the increased cost of Currey Ingram Academy. It is undisputed that Daughter has educational concerns that facilitated specialized programs. The trial court, as noted above, made specific findings regarding the children's needs and the conclusion to designate Wife as the primary residential parent, with sole decision-making authority regarding the children's education.

Husband contends that requiring him to pay the extraordinary educational expenses "imposes a financial burden on him" not recognized by the child support guidelines. However, in his brief, he has failed to cite to any evidence in the record to support this contention. The trial court properly assessed the financial abilities of the parents and the best interest of the children, in determining the deviation to be awarded for the extraordinary educational expenses. Accordingly, we do not find the trial court abused its discretion in ordering a deviation for extraordinary educational expenses. We affirm the decision of the trial court as to the issue of child support.

## C.    *Division of Marital Estate*

Husband next takes issue with the division of the marital estate. We begin addressing this issue by noting, "it is not our role to tweak the manner in which a trial court has divided the marital property." *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007) (citing *Morton v. Morton,* 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005)). "Rather, our role is to determine whether the trial court applied the correct legal standards," and weighed the applicable statutory factors in a manner that "is consistent

with logic and reason, and whether the trial court's division of the marital property is equitable." *Id.* (citations omitted).

Turning to Husband's argument, in his brief, he contends that the trial court erred in its division of marital assets. However, again Husband's central argument is that the trial court inequitably divided the marital estate as another form of punishment for his dishonesty to the court. Once again, he failed to cite specific references to the record to support this contention. Even more egregiously, Husband failed to include with his brief a proper table, in compliance with Rule 7 of the Rules of the Court of Appeals. Rule 7 provides, in relevant part:

> a) In any domestic relations appeal in which either party takes issue with the classification of property or debt *or with the manner in which the trial court divided or allocated* the marital property or debt, the brief of the party raising the issue *shall contain,* in the statement of facts or in an appendix, a table in a *form substantially similar* to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

> (b) Each entry in the table must *include a citation to the record* where each party's *evidence* regarding the classification or valuation of the property or debt can be found *and* a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

*Id.* (emphasis added).

Here, Husband did include attachments to his brief, which he contends complied with Rule 7. However, the attachments are merely a reproduction of the trial court's division of property, and the amended joint statement of assets and liabilities filed by the parties. While the attachments may, somewhat, provide us with valuations of the parties' separate and marital property and separate and marital debt, it does not comply with Rule 7. Wife noted the deficiency in her brief. Husband argued in his reply brief that he had complied with Rule 7. We emphasize that Rule 7 provides an exemplar. A table in compliance with Rule 7 would be substantially similar to this:

**Separate Property**

| Property | Appellant's Value | Appellee's Value | Value Found by the Trial Court | Party To Whom Awarded |
|---|---|---|---|---|
| 1. Description | $ | $ | $ | Husband or Wife |

| | (citation to the record) | (citation to the record) | (citation to the record) | (citation to the record) |
|---|---|---|---|---|

## **Marital Property**

| Property | Appellant's Value | Appellee's Value | Value Found by the Trial Court | Party To Whom Property Awarded |
|---|---|---|---|---|
| 1. Description | $<br>(citation to the record) | $<br>(citation to the record) | $<br>(citation to the record) | Husband or Wife<br>(citation to the record) |

## **Debt**

| Property | Appellant's Value | Appellee's Value | Value Found by the Trial Court | Party To Whom Property Awarded |
|---|---|---|---|---|
| 1. Description | $<br>(citation to the record) | $<br>(citation to the record) | $<br>(citation to the record) | Husband or Wife<br>(citation to the record) |
| Total Separate Property awarded to Husband as valued by: | | | | Husband: $ |
| | | | | Wife: $ |
| | | | | Trial Court: $ |
| Total Marital Property Awarded to Husband as valued by: | | | | Husband: $ |
| | | | | Wife: $ |
| | | | | Trial Court: $ |
| Total Debt allocated to Husband as valued by: | | | | Husband: $ |
| | | | | Wife: $ |
| | | | | Trial Court: $ |
| Total Separate Property awarded to Wife as valued by: | | | | Husband: $ |
| | | | | Wife: $ |
| | | | | Trial Court: $ |
| Total Marital Property Awarded to Wife as valued by: | | | | Husband: $ |
| | | | | Wife: $ |
| | | | | Trial Court: $ |

| Total Debt Allocated to Wife as valued by: | Husband: $ |
| --- | --- |
| | Wife: $ |
| | Trial Court: $ |

In order to comply with Rule 7, a party must do more than simply reproduce the findings of the trial court. We have explained the necessity of the requirements of Rule 7, stating:

> [I]t is essential that the parties comply with Rule 7 in order to aid this Court in reviewing the trial court's decision. The table required by Rule 7, allows this Court to easily and correctly determine the valuation and distribution of the marital estate as ordered by the trial court. Further, the Rule 7 table, allows this Court to ascertain the contentions of each party as to the correct valuations and proper distribution, as well as the evidence in the record which the party believes supports its contention. Consequently, a table, in full compliance with Rule 7, is vital as this Court must consider the *entire* distribution of property in order to determine whether the trial court erred. Moreover, this Court is under no duty to minutely search the record for evidence that the trial court's valuations may be incorrect or that the distribution may be improper.

*Kanski v. Kanski*, No. M2017-01913-COA-R3-CV, 2018 WL 5435402, at *6 (Tenn. Ct. App. Oct. 29, 2018) (citing *Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010). Furthermore, "where an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements." *Id* at *6. (quoting *Stock v. Stock,* No. W2005-02634-COA-R3-CV, 2006 WL 3804420, at *5, n.3 (Tenn. Ct. App. Dec. 28, 2006)).

As stated above, our role is to analyze whether the overall division of the marital estate was equitable. In order for us to properly complete this role, it is unequivocally essential for a litigant to include proper citations to the record for all proposed values of the marital estate. Here, Husband failed to include citations to the record wherein evidence was presented regarding the classifications, valuations, and division of the property. *See generally* Tenn. Ct. App. R. 7. The few citations Husband provided were in reference to the trial court's findings regarding the marital home. Without proper citations to the record, our ability to conduct a meaningful appellate review is hindered. Based upon Husband non-compliance with Rule 7, we conclude that he has waived all issues related to the classification, valuation, and division of the marital property and debt. We affirm the trial court's division of the entire marital estate.

### D. *Motion to Amend*

We next review Husband's fourth issue regarding denial of his motion to amend to assert a counterclaim for alimony. The Tennessee Rules of Civil Procedure address amendments, claims, and defenses. Specifically, in regard to amendments, we have succinctly explained:

Rule 15.01 governs amendments. It provides, in relevant part:

A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, the party may so amend it at any time within 15 days after it is served. Otherwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of court; *and leave shall be freely given when justice so requires.*

Tenn. R. Civ. P. 15.01 (emphasis added). This rule "applies equally to plaintiffs and defendants who seek to amend their pleadings." *Pratcher*, *[v. Methodist Healthcare Memphis Hosps*.,] 407 S.W.3d [727,] 741 [(Tenn. 2013).] The Tennessee Supreme Court has "emphasized the liberality of this rule where pre-trial amendments are sought." *Gardiner v. Word*, 731 S.W.2d 889, 891 (Tenn. 1987). According to the Court, the rule "'needs no construction, it means precisely what it says, that leave shall be freely given.'" *Id.* (quoting *Branch v. Warren*, 527 S.W.2d 89, 92 (Tenn. 1975)).

Tennessee courts adhere to "the time-honored principle that 'the determination of whether to allow an amendment to the pleadings is left to the sound discretion of the trial court.'" *Pratcher*, 407 S.W.3d at 741 (quoting *George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 486 (Tenn. 2001)). "Trial courts have broad authority to decide motions to amend pleadings and will not be reversed absent an abuse of discretion." *Id.* (citing *Hawkins v. Hart*, 86 S.W.3d 522, 532 (Tenn. Ct. App. 2001)). This standard of review does not allow us to substitute our judgment for that of the trial court. *Id.* at 742. However, the liberal language of Rule 15.01 has "substantially lessened the exercise of pre-trial discretion on the part of the trial judge." *Gardiner*, 731 S.W.2d at 891.

Numerous factors should guide a trial court's discretionary decision regarding whether to allow a late-filed amendment, including "undue delay, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments and futility of the amendments." *Pratcher*, 407 S.W.3d at 741 (citing *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979)).

*Stephens v. Home Depot U.S.A., Inc.*, 529 S.W.3d 63, 76-77 (Tenn. Ct. App. 2016).

In the instant case, Husband timely filed an answer on March 14, 2017, but did not assert a counterclaim. In February 2018, Wife was granted permission to amend her complaint to allege adultery. Husband promptly filed an amended answer but again did not assert a counterclaim. At the beginning of the trial on April 2, 2018, Husband's counsel indicated that on March 30, 2018, she had fax-filed an emergency motion to amend. The motion requested that Husband be allowed to file a counterclaim for alimony. The basis for Husband's argument was, despite the late filing of the motion, all parties were aware that alimony would be an issue at trial. He contended that the parties had discussed the issue in pretrial discovery. Husband concedes that he made no attempt to file a claim for alimony prior to March 30, 2018.

After a hearing on the motion, on the first day of trial, the trial court denied the motion. The trial found, *inter alia*, that:

> Husband delayed filing the Emergency Motion until Friday evening March 30, 2018, two days before the trial which started on Monday, April 2, 2018, to ask for a continuance and to seek leave to file new pleadings. The Court finds that this delay [sic] unacceptable and in bad faith. There is no excuse for this delay. If the Court should grant Mr. Sullivan a continuance for Wife to file a reply to the counterclaim and conduct additional discovery it would leave the parties in a living situation that appear[ed] to be fairly strained, if not intolerable.

> Husband argued in his brief filed on March 22, 2018 that he was seeking alimony. However, Husband's brief is not a pleading under the Tennessee Rules of Civil Procedure. While, the Court cannot state that it would be futile to allow the amendment for a claim of alimony, the history of this case reflects that both parties earn a good living. Mr. Sullivan earns something in the range of $90,000 a year. Wife earns three plus time[s] that amount of money. The marriage of 12 years is of moderate duration. For Husband to receive alimony until he dies or remarries, the Court would have to determine that Husband cannot be rehabilitated and the Court will need a plan of rehabilitation. Husband has a Master[']s degree and Bachelor[']s degree and this form of alimony does not appear to be applicable. Transitional alimony does not seem to fit either because that form of alimony is ordinarily designed to ease a person back into the workplace where they have been out of the workplace but have skills. It is usually for individuals who do not require rehabilitation but just time to readjust and to get into the workplace to earn a living and support themselves. Alimony *in solido* might fit this case but to allow the Husband

to amend his pleadings two days before trial would be unduly prejudicial to Wife.

Husband asks this Court to find that the trial court abused its discretion by denying his late-filed motion. He again maintains that the trial court's action was another form of punishment, without citing specific references to the record. Upon review of the record, we are not persuaded that the trial court abused its discretion. We affirm the decision of the trial court with regard to this issue.

### E.    Attorney's Fees

As a final issue, we address whether Wife should be awarded attorney's fees and expenses. The trial court made the following findings regarding Wife's request for attorney's fees:

> Ms. Sullivan incurred attorney's fees and expenses of $123,637.18 of which she had paid $54,959.72 and owes $68,677.44. Mr. Sullivan has incurred attorney's fees and expenses in the amount $65,846.50, of which he has paid $44,500.50 and owes $21,346.00. The balance of attorney's fees and expenses incurred by each party are marital debts. . . . Of the attorney's fees and expenses incurred by Ms. Sullivan, approximately $20,000 of those attorney's fees and expenses, as detailed in the Affidavit of [sic] filed on her behalf, were attributable to unnecessary litigation caused by Mr. Sullivan. For example, Mr. Sullivan filed contempt proceedings and other motions that were without merit. He sought to prevent Ms. Sullivan from obtaining records from Walgreens and CVS pharmacies, which ultimately brought out Mr. Sullivan's lies in both his written discovery responses and in his deposition. The Court would award Ms. Sullivan $20,000 of the attorney's fees and expenses she has incurred in connection with these proceedings, but knows of no authority for doing so except as alimony *in solido*. Ms. Sullivan has not provided the Court with any authority for such award otherwise. Ms. Sullivan has not asked for alimony and had she done so, she would not be entitled to alimony pursuant to Tenn. Code Ann. § 36-5-121.

It is within the discretion of the trial court to award attorney's fees. *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). Additionally, absent an abuse of discretion, appellate courts will not interfere with the trial court's ruling. *Id*. Wife argues that the trial court also had the statutory authority to award her attorney fees concerning the adjudication of custody of the children, as set forth in Tennessee Code Annotated section 36-5-103(c). She contends that the mere fact that she did not request alimony *in solido* does not prevent the trial court from awarding the fees. Tennessee Code Annotated section 36-5-103(c)(2017) provided as follows:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

*Id*.[16]

We agree with the trial court that an award of attorney's fees in a divorce case may constitute alimony *in solido*. *See Gonsewski v. Gonsewski*, 350 S.W.3d at 99, 113 (Tenn. 2011). We further agree that, when deciding whether to award attorney's fees as alimony *in solido,* the trial court must consider the relevant factors set forth in Tennessee Code Annotated section 36-5-121(i). *Id*. However, Tennessee Code Annotated section 36-5-103(c) provides another avenue for an award of attorney's fees. Although we do not agree with the trial court's reasoning, in reviewing the entire record, we do not find that the trial court abused its discretion in denying Wife's request for attorney's fees at trial.

As to Wife's request for attorney's fees on appeal, we consider, "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014). While we understand the financial burdens these proceedings have placed on both parties, given Wife's financial position, we do not find an award of attorney's fees on appeal is appropriate. Therefore, we deny Wife's request for attorney's fees on appeal.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed and the case remanded for further proceedings as may be necessary. Costs of this appeal are taxed to the appellant, Eric Jason Sullivan, for which execution may issue if necessary.

_____
CARMA DENNIS McGEE, JUDGE

---

[16] The statute was amended on July 1, 2018, but the amendment does not apply to this action. *See* Tenn. Code Ann. § 36-5-103(c)(2018).